Bijan Amini (bamini@aminillc.com)
Lita Beth Wright (lbwright@aminillc.com)
Reece C. Dameron (rdameron@aminillc.com)
AMINI LLC
131 West 35th Street, 12th Floor
New York, New York 10001
(212) 490-4700

*Attorneys for Defendants Weld Holdco, LLC*
*and Woodrow D. Weld*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HITACHI CONSTRUCTION MACHINERY CO., LTD, A JAPANESE CORPORATION,<br><br>                    Plaintiff,<br><br>          v.<br><br>WELD HOLDCO, LLC, A DELAWARE LIMITED LIABILITY COMPANY, AND WOODROW D. WELD, AN INDIVIDUAL,<br><br>                    Defendants. | Case 1:23-cv-00490-NRB<br><br>**ANSWER AND AFFIRMATIVE DEFENSES**<br><br>**(With Jury Demand)** |

Defendants Weld Holdco, LLC and Woodrow D. Weld (collectively the "Defendants"), by and through their undersigned counsel, Amini LLC, hereby submit this Answer to Plaintiff Hitachi Construction Machinery Co., Ltd.'s ("HCM" or "Plaintiff") Complaint as follows:

1.      The allegations in paragraph 1 contain legal conclusions to which no response is required. To the extent a response is required, Defendants admit that Weld Holdco, LLC ("WH") owns 66 2/3% of Acme Business Holdco, LLC ("Acme"), admit that Acme is engaged in the rental of construction equipment, admit that HCM has a minority stake in Acme through a wholly owned entity, deny the remainder of the allegations and refer the Court to the agreements referred to in paragraph 1 of the Complaint for their true content and terms.

2.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 2.

3.      Defendants admit that WH is a limited liability company, and WH avers it has a mailing address in Arizona.

4.      Defendants admit that Weld is an individual domiciled in Arizona, and Weld avers that he has a mailing address located at 5347 E Royal Palm Rd., Paradise Valley, Arizona 85252.

5.      The allegations in paragraph 5 are legal conclusions to which no response is required.

6.      The allegations in paragraph 6 are legal conclusions to which no response is required.

7.      The allegations in paragraph 7 are legal conclusions to which no response is required.

8.      Defendants admit the allegations in paragraph 8.

9.      Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 9.

10.     Defendants admit that HCM owns through HIUS 33 1/3 of Acme's common units, and that WH owns the remaining units, and avers that the remaining allegations of paragraph 10, either in whole or in part, are legal conclusions to which no response is required and refer the Court to the Transaction Documents for their true content and terms. To the extent any response is required, the remaining allegations are denied.

11.     Defendants refer the Court to the MCGA and all other Transaction Documents for their true content and terms. To the extent any response is required to paragraph 11, denied.

12.     Defendants refer the Court to the MCGA and all other Transaction Documents for their true content and terms. To the extent any response is required to paragraph 12, denied.

13.     Defendants refer the Court to the MCGA and all other Transaction Documents for their true content and terms. To the extent any response to paragraph 13 is required, denied.

14.     Defendants refer the Court to the MCGA and all other Transaction Documents for their true content and terms. To the extent any response to paragraph 14 is required, denied.

15.     Defendants refer the Court to the MCGA and all other Transaction Documents for their true content and terms. To the extent any response to paragraph 15 is required, denied.

16.     Defendants refer the Court to the MCGA and all other Transaction Documents for their true content and terms. To the extent any response to paragraph 16 is required, denied.

17.     Defendants refer the Court to the MCGA and all other Transaction Documents for their true content and terms. To the extent any response to paragraph 17 is required, denied.

18.     Defendants refer the Court to the MCGA and all other Transaction Documents for their true content and terms. To the extent any response to paragraph 18 is required, denied.

19.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 19.

20.     Defendants deny knowledge or information sufficient to form a belief as to the allegations in paragraph 20, except that Defendants are informed and believe that HCM withdrew its letters of guaranty in favor of Acme in breach of the implied and express provisions of the Transaction Documents.

21.     Defendants lack knowledge or information sufficient to form a belief as to the allegations of paragraph 21, except aver that HCM was obligated under the Transaction Documents to provide letters of guarantees of loans and other debt obligations of Acme.

22.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 22.

23.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 23.

24.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 24.

25.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 25.

26.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 26.

27.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 27.

28.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 28.

29.     Defendants state that the allegations in paragraph 29 are legal conclusions to which no response is required. To the extent any response is required, Defendants deny that the allegations were judicial admissions.

30.     Defendants state that the allegations in paragraph 30 are legal conclusions to which no response is required and refers the Court to the documents referenced in paragraph 30 and all Transaction Documents for their true content and terms. To the extent any response is required, Defendants deny that the quoted language constitutes a judicial admission.

31.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 31.

32.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 32.

33.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 33.

34.     Defendants admit that HCM sent letters on November 21, 2022 and December 16, 2022 and refer the Court to the writings and all Transaction Documents for their true content and terms. Defendants deny that the amount demanded was calculated at Weld and WH's proportionate ownership percentage. Defendants deny the remaining allegations in paragraph 34.

35.     Defendants state that the allegation in paragraph 35 states a legal conclusion, the MCGA speaks for itself and no response is required. To the extent any response is required, denied.

36.     Defendants state that the allegations in paragraph 36 are legal conclusions to which no response is required. To the extent a response is required, denied.

37.     Defendants deny the allegations in paragraph 37.

38.     Defendants incorporate each and every response to HCM's allegations as if stated fully herein.

39.     Defendants deny the allegations in paragraph 39.

40.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 40.

41.     Defendants deny the allegations in paragraph 41.

42.     Defendants deny the allegations in paragraph 42.

43.     Defendants deny the allegations in paragraph 43.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL AFFIRMATIVE DEFENSES

## INTRODUCTION

1.     HCM's repeated breaches of the parties' agreements and bad faith conduct triggered the alleged default of defendants Woodrow Weld ("Weld") and Weld Holdco, LLC

("WH") under the Master Cross-Guarantee Agreement ("Master Guarantee") that HCM seeks to enforce here. At all relevant times, Acme Business Holdco, LLC ("Acme") and its affiliates were current on the payments on loans that were the alleged subject matter of the Master Guarantee. HCM created the alleged default by withdrawing its guarantee in breach of the parties' agreements, implied and express.

2.    Over the past five years, HCM, nominally a one-third owner of Acme, has wielded control over Acme's business through a combination of not only its management rights at Acme but also more importantly control over Acme's debt and capital expenditure plans. HCM used that control to methodically and in bad faith strip Weld and WH of the agreed upon means to achieve the business plan that was an integrated and integral part of the parties' Equity Purchase Agreement ("EPA"), the Amended and Restated Limited Liability Company Agreement of Acme (the "LLC Agreement") and related agreements (collectively, the "Transaction Documents" defined below.) The Transaction Documents permitted HCM to acquire 100% of Acme in three equal tranches over several years.

3.    Because a decades old joint venture agreement with John Deere (the "Deere JV") precluded HCM from establishing market share in the Americas directly, beginning in or about 2017, HCM sold Weld on a plan to distribute several hundreds of pieces of HCM equipment in North America through HCM's purchase of Acme. In March 2018, HCM approved the acquisition and, through a special purpose investment vehicle, inked the Transaction Documents. The Transaction Documents included the original Master Guarantee, which HCM assured Weld and WH in writing was "mainly for accounting purposes," and an HCM-approved, jointly prepared business plan to rebuild Acme's business as an outlet in the Americas for HCM's large excavators by the time HCM's acquisition of Acme was complete—the stated goal of the transaction for both

parties. As explained below, HCM's bad faith, post-closing conduct has deprived Weld and WH of the benefit of the parties' bargain under those agreements and has caused them to suffer at least $250 million in damages.

4.    The business plan's success hinged on Acme's ability to (i) continue to operate Acme's core, legacy business in aerial lift equipment to generate cash flow, and (ii) leverage financing that HCM facilitated with its lenders to "re-fleet" Acme with HCM branded equipment. For the business plan to work, the Transaction Documents (including as later modified) required Acme to re-fleet in two ways. Acme had to: (i) acquire up to six equipment rental companies, which would both re-fleet Acme and provide a mechanism to maintain and distribute the new fleet in the Americas, and (ii) buy 1,702 of HCM's large scale excavators from John Deere and 476 wheel loaders from Hitachi Construction Machinery America, Inc. ("HCMA"), a wholly owned HCM subsidiary.

5.    A number of HCM's obligations under the deal caused Weld and WH to enter into the EPA and Transaction Documents and provided the basis for the parties' business partnership: (i) as noted above, HCM's agreement to facilitate Acme re-fleeting with HCM-branded equipment; (ii) the Transaction Documents required HCM, as a financial partner, to arrange and maintain credit for Acme so Acme could re-fleet; and (iii) the resulting accretive earnings and profits that would have flowed to Weld had HCM performed its obligations, both express and implied, under the Transaction Documents.

6.    Deciding it did not like the deal it cut with Weld and WH, and through its control of Acme, HCM intentionally undertook a series of actions designed to prevent Acme from re-fleeting. Immediately after closing on the first tranche, HCM unilaterally nixed the mutually agreed on business plans on which Acme's ability to re-fleet with Hitachi-branded equipment

depended. Over the next three years, an unmistakable pattern emerged: every time Acme prepared and HCM approved a revised business plan, HCM unilaterally changed its mind and stymied Acme's agreed upon business plans in violation of the Transaction Documents.

7.     HCM's bad faith conduct continued after Acme, with HCM's agreement, sold its aerial lift equipment in July 2021 at a healthy profit while HCM was simultaneously and secretly negotiating the end of the Deere JV. Weld proposed that the proceeds be used to finally achieve the parties' goal of expanding Acme's fleet of HCM excavators by purchasing one of the companies under consideration to replace the aerial equipment business and assist in deploying the anticipated new fleet. The sale created a unique opportunity for HCM to leverage the disposition of the aerial lift equipment (which HCM does not manufacture) and replace such equipment with Hitachi-branded equipment without infusing additional capital into the business.

8.     HCM of course agreed to the July 2021 sale of the aerial fleet but required Acme to distribute the associated profit to WH, specifically to lower HCM's purchase price for the second tranche, which was calculated using a multiple of Acme's net earnings at year end. Even with that decision, Weld still planned to use a significant portion of the sale proceeds to execute the new business plan HCM approved in connection with the sale—expansion through Acme's acquisition of a target company and the purchase of tens of millions of dollars of HCM excavators. Because of that plan, Acme and Defendants even agreed to a five-year non-compete agreement, which HCM encouraged, substantially tying Weld's hands from engaging in any other rental business for the near future.

9.     In August 2021, on the same day HCM announced the news publicly, Weld learned from HCM executive Masafumi Senzaki that HCM had been working to end the Deere JV all along and had finally succeeded. According to press reports, HCM could hardly contain itself, and

was "really celebrating[,]" stating that "[i]t feels for us like the skies have opened up[,]" "[a]nd we can do everything in our power to build the Hitachi brand in North America. And that's really what we want as a global construction brand."

10. With "the skies hav[ing] opened up" for HCM in North America, HCM no longer needed Acme to penetrate the market. Despite earlier agreed business plans to do so, HCM told Acme it did not have the equipment to sell to Acme and would not approve the proposed acquisition that had been part of the most recent HCM-approved sales plan either. Instead, HCM demanded Defendants relinquish Acme to HCM without any paying further consideration despite their agreements requiring hundreds of millions of dollars to Defendants to do so.

11. In November 2022, HCM withdrew its guarantees of Acme's debt (another breach of the Transaction Documents), allegedly paid off the $384 million in outstanding debt and demanded that Weld and WH immediately repay HCM under the Master Guarantee. HCM did so to force Weld to hand to HCM the company he built without having to pay the agreed price for the second and third tranches.

12. As a result of HCM's bad faith conduct, HCM deliberately manufactured the alleged default upon which its current Complaint rests and deliberatively drove down the value of Weld and WH's interest in Acme, when HCM should have paid them at least $250 million to buy the last two-thirds of their interests in Acme under the Transaction Documents.

## I.    RELEVANT FACTUAL BACKGROUND

### A.    The Parties

13. Weld founded Acme Lift Company in 1997 and created a unique wholesale rental business model. Acme Lift maintained a fleet of aerial lift equipment such as scissor lifts, boom lifts, and telehandlers that it would rent to retail equipment rental companies. As Acme Lift grew,

Weld created new companies to expand into new equipment lines. By renting from Acme Lift and its affiliates, Acme's retail rental customers could ensure they always had the equipment their customers needed without making additional capital expenditures. Because the business model Weld developed positioned Acme Lift between original equipment manufacturers and retail rental companies, Acme Lift became a trusted partner to both industries.

14.    Acme Lift and its affiliates managed their equipment fleets centrally from Arizona using an enhanced technology platform. Acme Lift's equipment was normally stored and maintained at its customers facilities. This structure allowed Acme Lift to reduce its staff and infrastructure costs and thus provide competitive rental rates and broad distribution of its equipment. By 2017, Weld's companies included Acme Lift Holding Co., LLC, Acme Lift Company, LLC, MacKinnon Skye Holdings, LLC, Global Equipment Management, LLC, and A-Aircomp, LLC (the "Acme Businesses"). The companies generated tens of millions in revenue, and, under Weld's model, excellent margins based on the industry-standard profitability metric called "earnings before interest, tax, depreciation, and amortization, also known as "EBITDA".

15.    Weld created Weld Holdco, LLC as a Delaware LLC in January 2018 and consolidated the ownership of the Acme Businesses under Weld Holdco in preparation for the HCM's investment.

16.    Acme Business Holdco, LLC was also created as a Delaware LLC in January 2018, and, on March 9, 2018, Weld caused Weld Holdco to contribute the Acme Businesses to Acme Business Holdco, LLC.

17.    HCM's investment vehicle was Hitachi Construction Machinery Holding U.S.A. Corporation, ("HHUS") and Takaya Kawamoto executed the Transaction Documents on behalf of HHUS. In December 2018, HHUS allegedly transferred its equity in Acme to Hitachi Construction

Machinery Investments USA Corporation ("HIUS"). HIUS is a wholly owned subsidiary of HHUS, and HHUS is a wholly owned subsidiary of HCM.

18.     HIUS and HHUS are merely investment vehicles, however, and HCM's employees and officers regularly directed business decisions about Acme through direct interactions with Acme personnel and Acme's board of managers. HCM employees Tatsuya Chou, Hidehiko Matsui, Yasushi Ochiai and Motohiro Narao (and others at HCM) negotiated HCM's investment in Acme. After the deal was closed, Narao had regular contact with Weld and Acme, and HCM appointed Nagashima and Masaaki Hirose to Acme's board of managers. In a February 21, 2020 letter to Weld, HCM acknowledged that it was bound by the EPA and other Transaction Documents.

19.     Hirose was president of HCMA, a wholly owned subsidiary of HCM responsible for distributing wheel loaders in North America. Hirose currently serves as an executive officer of HCM.

20.     Masafumi Senzaki, then Chief Operating Officer and Senior Vice President of HCM, is the HCM employee who, in October 2021, presented HCM's new strategy to Acme, WH and Weld after HCM successfully ended the Deere JV, as discussed below. Senzaki would later inform Weld that HCM's board of directors had decided not to purchase the second tranche of equity in Acme. Weld and WH then attempted to negotiate directly to salvage the transaction with Senzaki and Ty Umabiki, an associate general manager at HCM, over the course of 2022 without success. HCM has since announced that Senzaki will become HCM's President on April 1, 2023.

**B.     HCM Seeks to Circumvent the Deere JV and Build a Presence in North and South America by Acquiring Acme**

21.     By at least 2017, HCM's majority owner, Hitachi Ltd., had determined to sell a majority of its stake in HCM. To achieve that goal, HCM had to increase its presence in North and

South America, the world's largest markets for large scale earth moving equipment, but the Deere JV prevented it from doing so. Under the Deere JV, John Deere had the exclusive right to sell Hitachi equipment in those markets with certain limited exceptions. HCM used John Deere's well-established dealer and distribution network as the exclusive means for distributing HCM designed and manufactured construction machinery in the Americas for decades. However, John Deere favored the identical equipment it manufactured under its own brand under the Deere JV and at the expense of HCM. HCM retained the right to distribute certain other earthmoving equipment, including wheel loaders, and had a small network of dealers run by HCMA for its wheel loaders in the United States. By 2017, HCMA had failed to substantially improve HCM's position in North America without the ability to distribute excavators into the market directly.

22.    In October 2017, HCM approached Acme to increase its presence in the American markets through an acquisition of Acme's wholesale rental business, which HCM believed would permit it to increase HCM's North American market penetration while circumventing the Deere JV's restrictions.

23.    HCM's initial letter of intent to Weld and the Acme Businesses, dated October 31, 2017, proposed a three-step acquisition of the Acme Businesses based on an enterprise value of $296,658,400 "assuming it is sold on a debt-free, cash-free basis with a normalized level of working capital at closing."

24.    Under this proposal, Weld's membership interests in Acme Business Holdco, held through WH, would be sold to HCM in three tranches.

C.    **The "Transaction Documents"**

25.    HCM's investment in Acme was embodied in a series of related and integrated agreements and business plans. The EPA defines "Transaction Documents" as "collectively, this

Agreement, the Confidentiality Agreement, the Operating Agreement, the Weld Employment

Agreement, the Employment Agreements, and each other agreement, document, instrument and/or

certificate contemplated by this Agreement to be executed in connection with the transactions

contemplated hereby." This definition includes, *inter alia*, the Guarantee Agreement, Guarantee

Fee Agreement and all business plans approved by HCM and Acme's board of managers following

the closing.

<em>a.    The EPA</em>

26.    The EPA set the terms of the sale and purchase of Acme's equity in three equal

tranches: (i) $35 million to WH at closing for the first one-third (the "First Tranche"), (ii) the

greater of a formula based on 7 times EBITDA as of December 31, 2021 or $50 million to WH for

the second one-third (the "Second Tranche"); and (iii) the last one-third at a formula based on 6

times EBITDA as of December 31, 2024 (the "Third Tranche") to WH.

27.    Section 5.12 of the EPA is a non-competition covenant that was included in the

EPA to protect Acme's ability to achieve its goals for increasing HCM's market share in North

America. Section 5.12 states that HHUS and its controlled Affiliates "shall not directly or

indirectly, within the Restricted Territory engage in, manage, operate, join, control or participate

in a Business." Business is defined in the EPA to mean "the leasing, renting or otherwise providing

construction equipment to any Person that is in the business of renting, leasing or otherwise

providing such construction equipment to end-users."

28.    The EPA preserved Weld's right to raise certain defenses "[n]otwithstanding

anything to the contrary herein or in any other Transaction Document." The defenses retained by

Weld include "any defenses, set-offs or counterclaims which Weld may allege or assert against the

Purchaser in respect of the Guaranteed Obligations" and "the failure of consideration, breach of

warranty, payment, statute of frauds, statute of limitations, accord and satisfaction, or usury."

29.    The EPA incorporated Acme's LLC Agreement, which was an exhibit to the EPA, a Guarantee Agreement, and a Guarantee Fee Agreement, among other documents.

30.    The EPA made delivery of the executed LLC Agreement a condition to closing.

   b.    *The LLC Agreement*

31.    As detailed below, the LLC Agreement vested control in HCM over nearly every aspect of Acme's business by requiring unanimous consent of the board of managers, including HCM's board designees, for approval of, *inter alia*, all business plans and modifications to business plans, incurring indebtedness in excess of $1 million, making capital expenditures in excess of $1 million, purchasing any fleet unless included in an HCM-approved business plan and approving a liquidity event and establishing a strategic alliance by merger or otherwise. Through HCM's board designees, HCM had veto power over all of Acme's material business decisions.

   c.    *The Guarantee and Guarantee Fee Agreements*

32.    The Guarantee Agreement was defined in the EPA, was attached as an exhibit to the EPA, and its delivery was also a condition to closing. This Guarantee Agreement was a predecessor to the Master Guarantee under which HCM has sued Weld and WH here.

33.    The Guarantee Fee Agreement was also defined in the EPA, attached as an exhibit to the EPA, and its delivery was also a condition to closing. It was also referenced in the LLC Agreement.

34.    The Guarantee Agreement and the Guarantee Fee Agreement were among HCM, Weld, and Weld Holdco. Thus, while the Equity Purchase Agreement is among Weld, WH, and HHUS, an investment vehicle HCM used for this transaction, the entire transaction involved multiple contracts and included HCM.

35.    The Guarantee Agreement provides that HCM owns 33 and 1/3% of Acme through HHUS, and that HCM, not HHUS, agreed to act as a guarantor for the repayment of 100% of Acme's new $220 million loans from Bank of Tokyo-Mitsubishi UFJ Ltd., New York Branch. The Guarantee Agreement also says Weld and WH would reimburse HCM if HCM paid on its guarantee to the bank, but that Weld and WH's liability would be limited to their equity ownership percentage in Acme. This Guarantee Agreement was a predecessor to the Master Guarantee under which HCM has now sued Weld and WH, and is, for the most part, on substantively identical terms.

36.    Over the course of the relationship between the parties, HCM required Weld and WH to sign new guarantee agreements when Acme took out additional debt. This culminated in the June 30, 2022 Master Cross Guarantee Agreement that covered Acme's loans from MUFG Bank, Mitsubishi HC Capital ("MHC"), Sumitomo Mitsui Banking Corporation ("SMBC"), and Sumitomo Mitsui Finance and Leasing Co. ("SMFL"). HCM also required that Acme to pay HCM a fee to guarantee Acme's loans, and therefore requested the Guarantee Fee Agreement.

## II.    HCM TAKES CONTROL OF ACME AT CLOSING DESPITE ITS MINORITY STAKE

### A.    As Reflected in the Transaction Documents, HCM Bargained for Control from the Start

37.    Under the EPA, key conditions to closing gave HCM control over Acme's ability to meet the March 2018 business plan that HCM and Acme developed jointly, notwithstanding HCM's initial minority investment. As discussed below, HCM's bad faith actions did not (and could not reasonably be expected to) benefit Acme, Weld or WH.

38.    First, Sections 8.05(a), 8.10 and 8.13 of the LLC Agreement provided HCM's designees on Acme's board (or, as it turned out in practice, HCM) with veto power over every

significant aspect of Acme's business. Section 8.05(a) provided that a quorum of the board required a majority of the managers serving be present, at least one of which had to be an HCM-designated manager. Sections 8.10 and 8.13 identified actions that require unanimous approval of Acme's board. For example:

   a.  <u>Section 8.10(g)</u>—incurring any indebtedness or amending the terms of any indebtedness over $1,000,000;

   b.  <u>Section 8.10(j)</u>—making any capital expenditures over $1,000,000 unless otherwise provided for in the "Business Plan";

   c.  <u>Section 8.10(k)</u>—purchasing any fleet, unless otherwise included in "the Business Plan";

   d.  <u>Section 8.10(p)</u>—entering into any kind of strategic alliance, whether by merger, acquisition or otherwise;

   e.  <u>Section 8.10(q)</u>—disposing any shares or other interest, assets or business of Acme or the Acme Businesses;

   f.  <u>Section 8.12(r)</u>—changing Acme's business;

   g.  <u>Section 8.10(t)</u>—approving or amending any Business Plan, annual budget or strategic plan, or taking any action that would cause an increase in operating expenses in an approved Business Plan; and

   h.  <u>Section 8.13</u>—defining the content of and the process to create each Business Plan, which, in turn, required unanimous approval of Acme's board of managers, as did any modifications to the Business Plan. *Id.* at 8.13(d) ("The Business Plan may not be modified except by unanimous approval of the Managers in accordance with **Section 8.10(t).**") (emphasis in original.)

39.    Second, under Section 7.2(f) of the EPA, Acme had to refinance and consolidate the Acme Businesses' existing loans and credit lines with HCM's current, preferred lenders. HCM's lenders extended new loans to Acme based strictly on HCM's credit and history and required HCM to guaranty 100% of the loans to Acme. At no time did HCM's preferred lenders look to Acme's creditworthiness. Instead, the lenders relied on HCM's creditworthiness.

40.    At the time HCM's investment closed, the Acme Businesses had approximately $198 million in debt spread across several lenders. HCM required the loans to be consolidated into a $140 million line of credit with The Bank of Tokyo-Mitsubishi UFJ, Ltd. and $80 million in notes payable to The Bank of Tokyo-Mitsubishi. As referenced in the Transaction Documents, Acme took out these two loans on March 13, 2018, the day after the parties signed the first of the Transaction Documents.

41.    Section 5.09 of the March 12, 2018 LLC Agreement states:

> **Section 5.09 Third Party Loans.** HCM shall use its reasonable best efforts to permit the Company to obtain debt financing from a third-party lender following the date hereof (including in connection with the establishment of the Company Retail Business). If, subject to **Section 8.10(g)**, the Company obtains such third-party lender financing, each Member shall guarantee the obligations of the Company and the Company Subsidiaries pursuant to such loans pursuant to customary guaranty agreements (in a form reasonably acceptable to the Members), which obligation shall be limited to each Member's aggregate portion of Units held by such Member; provided, the Member shall enter into customary indemnification and contribution agreements with respect to such guaranty agreements (in a form reasonably acceptable to the Members).

42.    As used in the LLC Agreement, "HCM" refers to HHUS, the investment vehicle, not its parent, but the investment vehicle never guaranteed Acme's loans. Nor did the investment vehicle make any efforts to obtain debt financing for Acme. HCM did and, as explained below, was the only guarantor to which Acme paid a guarantee fee.

**B.    According to HCM, the Purpose the Guarantee Agreement with Weld and WH was "mainly for accounting purposes" so HCM's Financial Statements Would Not Reflect that its Guaranty of Acme's Debt Directly Reduced the Value of its Investment in Acme**

43.    HCM's guarantee of the full amount of the loans was a condition precedent to The Bank of Tokyo-Mitsubishi (which later became MUFG Bank, Ltd. ("MUFG")) providing the loans to Acme. If HCM withdrew its guarantee or took any action to "discontinue or assert the invalidity

or unenforceability of [HCM's guarantee,]" Acme would be in default, which would trigger HCM's guarantees.

44. Since the Guarantee Agreement could require Weld and WH to reimburse HCM if it paid out on the guarantee, Weld asked HCM whether he should also receive a guarantee fee from Acme. On March 10, 2018, HCM's representative Seiji Nagashima responded stating:

> The purpose of the Guarantee Agreement is mainly for accounting purpose [sic].
> We [HCM] need to recognize ACME as subsidiary without Guarantee Agreement.
> *In case we fulfill an obligation, we expect to claim for compensation to ACME firstly after refinance is arranged.*
> We believe we don't enjoy benefits from this Guarantee Agreement other than described above, and request fee only to extent of our portion.

45. Thus, HCM requested the Guarantee Agreements and Guarantee Fee Agreement as a condition for the acquisition because it did not want to have to consolidate Acme's business (or Acme's debt) on HCM's financial statements. At all relevant times before and after closing, HCM knew that Weld and Weld Holdco would not have the ability to pay their proportionate share of the debt under the Guarantee Agreements without Acme, and that HCM was the only recourse the banks had for Acme's debt. That is because, under the EPA, Guarantee Agreement, and Guarantee Fee Agreement, HCM's responsibility for the loans increased pro rata as HCM purchased the Second Tranche and Third Tranche as Weld's and WH's decreased proportionately. Overall, this structure meant that HCM was responsible for guaranteeing 100% of Acme's debts in the first instance. When HCM purchased the Third Tranche, the Transaction Documents provided that HCM would be solely responsible for Acme's debts.

C.    **The March 2018 Business Plan**

18

46.     The parties closed the deal on March 12, 2018 and the board of managers met on the next day to establish a business plan as required under Section 8.13(a) of the LLC Agreement.

47.     At closing, Acme and its subsidiaries did not have a large fleet of excavators and other earth moving equipment that it could begin renting immediately because its business's bread and butter was the wholesale rental of aerial equipment. Acme and its subsidiaries had little or no Hitachi branded equipment and little experience servicing excavators.

48.     The March 2018 business plan thus called for Acme to provide HCM equipment to end users through two primary channels. First, Acme would acquire lighter excavators—those under 20 tons—and rent them to retail rental companies consistent with Acme's legacy business model.

49.     Second, for larger excavators, HCM, Acme, and Weld intended to create a network of affiliated retail rental companies that could service and maintain the excavators. The March 2018 business plan called for Acme to acquire one retail rental company "inside" Acme plus many others "outside" of Acme which were supposed to be rolled up in Acme when the Second Tranche closed. Consistent with this business plan, Section 16.01 of the LLC Agreement acknowledged Weld's right to invest in or acquire other retail rental companies "outside" of Acme, which "outside" of Acme acquisitions HCM would purchase when it purchased the Second Tranche.

50.     HCM wanted this structure—with just one retail rental company bought by Acme and several outside of Acme—because it was concerned that Acme buying all of them would potentially violate the John Deere joint venture agreement or at least catch John Deere's attention. By having Weld acquire the other companies, and then roll them up into a later tranche, HCM believed it could avoid conflicts with John Deere.

51.     The March 2018 business plan identified five target companies for acquisition, including Illinois Truck & Equipment, Ecco, and PacWest, so HCM was aware from the start which companies Acme intended to target. Acme's business plan also called for acquiring some new Hitachi branded equipment. Acme could purchase some wheel loaders from Hitachi dealers, but, due to the Deere JV, would need to purchase 56 excavators from John Deere dealers at retail pricing.

## III.    ALMOST IMMEDIATELY AFTER CLOSING, HCM STOPS ACME FROM PURSUING THE APPROVED MARCH 2018 BUSINESS PLAN AND RETRADES

52.     In April 2018, HCM told Acme to stop all work on the March 2018 business plan. HCM requested a board meeting set for April 17, 2018 be cancelled and told Acme that it might not approve or guarantee a $50 million fleet loan. HCM unilaterally postponed Acme's then proposed acquisition of PacWest, which was well underway prior to closing as HCM knew, as was Acme's proposed acquisition of another company.

53.     On June 5, 2018, HCM presented its "Updated Policy on Acme Project" to Acme. HCM sought to unilaterally impose several limitations on Acme's business that were not contemplated by the March 2018 business plan HCM and Acme had developed prior to closing. HCM demanded significant changes, including a "freeze" on all acquisitions other than PacWest and that Acme focus on wholesale rental to other national rental companies.

54.     HCM further demanded that Acme not proceed with any other acquisition during the first tranche period, i.e., through December 31, 2021. HCM specifically told Acme it could not proceed with the planned acquisition of Illinois Truck & Equipment, another target identified in the March 2018 business plan.

55.     Suddenly, HCM took the position it was "out of [HCM's] purpose" to enter into retail rental business or to create a new network by rental company acquisitions. HCM further said

that outside acquisitions by Weld were "not recommendable" and HCM could not consider consolidating those purchases even after the Second Tranche. This was the first of several breaches by HCM of Sections 8.10(t) and 8.13(d) of the LLC Agreement because HCM repeatedly, unilaterally modified the March 2018 Business Plan Acme's board of managers unanimously approved less than two months earlier.

56.     Each of these positions was contrary to the intent of the parties as embodied in the Transaction Documents, including the March 2018 Business Plan. Throughout June 2018, HCM requested amendments to Section 16.03 of LLC Agreement so that HCM would not be obligated to purchase companies acquired by Weld if HCM exercised the Second Tranche option.

**A.     The August 2018 Memorandum of Understanding between HCM, Weld and WH ("First MOU") Tightens HCM's Control of Acme**

57.      In August 2018, HCM, Weld and WH executed the First MOU which eliminated valuable rights belonging to Weld and placed other restrictions on Acme that were at odds with the Transaction Documents and the March 2018 business plan.

58.     Contrary to the Transaction Documents, the First MOU eliminated Weld's right to acquire outside companies that HCM would acquire in the Second Tranche. Contrary to HCM's original thinking, the First MOU required acquisitions of retail rental outlets be made by Acme, not Weld, and limited to six the amount of acquisitions Acme could make before September 30, 2020. The First MOU also specified certain new procedures Acme had to follow before acquiring a company, all requiring HCM's consent, participation or both. The First MOU also shifted control over all acquisitions to HCM through its seats on Acme's board of managers and veto rights under Section 8.10 of the LLC Agreement, because Acme, not Weld, would now be the acquirer.

59.     The sole "concession" HCM made for Weld giving up his valuable right to purchase retail rental companies outside of Acme was to require HCM to provide a notice to Weld by March

12, 2020 stating whether HCM intended, as of that date, to go forward with the Second Tranche. As HCM knew, Weld requested such notice because, if HCM decided not to proceed with the Second Tranche, Weld would need a significant amount of time to raise the financing needed to return the $35 million initial payment to HCM and refinance any debt HCM had moved to its own lenders.

60.     On the "one year anniversary of our joint venture" in March 2019, HCM executive Ochiai used the occasion "…to remind [Weld] that ACME's further developments are very much expected in the near future by [HCM] and we would also appreciate your input as to how we can make our rental solution reliable to the customers." In keeping with HCM's expectation, after the First MOU, Weld and Acme identified several companies as potential acquisition targets to achieve "AMCE's further developments . . . in the near future", but, as with Pac West, HCM prevented Acme from acquiring all but one—Ecco.

61.     Acme bought Ecco in October 2019 for approximately $100 million. HCM approved the purchase and required Acme to fund the acquisition through 100% debt financing rather than a combination of debt and equity. On October 29, 2019, Acme borrowed approximately $108 million from Sumitomo Misui Banking Corporation ("SMBC"), one of HCM's lenders, to purchase Ecco. Like Acme's other loans with HCM's preferred lenders, SMBC conditioned the loan on HCM's 100% guarantee of the loan and did minimal due diligence of Acme before making the loan.

62.     On March 12, 2020, HCM purported to notify Weld and Weld Holdco that as of that date, HCM intended to buy the Second Tranche, but HCM hedged, saying the decision to buy the Second Tranche still required HCM's board's approval. As stated, HCM's March 12, 2020 notification was wholly illusory and expressed no one's intent. In late September 2021, Masafumi

Senzaki finally admitted to Weld that "to realize our management's thinking requires a resolution of the [HCM] board of directors as a company decision." By HCM's own admission, its board had made no decision as of March 12, 2020 about whether to proceed with the Second Tranche. It took another three months after Senzaki's admission for HCM to inform Weld that it was not buying the Second Tranche.

> **B.      Acme Sells its Aerial Equipment to United Rental with HCM's Approval, and HCM Unilaterally Changes the Deal Again with the Second Memorandum of Understanding ("Second MOU")**

63.     In June 2021, United Rentals Inc. ("URI") offered to buy Acme's entire aerial lift business on an enterprise basis for approximately $275 million so long as the deal included five-year non-competes in the aerial left space from Weld and Acme (the "Aerial Lift Business"). This purchase price represented a premium of approximately $100 million over the net book value of the equipment alone.

64.     Because HCM refused to allow Acme to re-fleet, either through acquisition or buying HCM-branded equipment from John Deere and HCMA, Weld saw the URI sale as an opportunity to get Acme back on track. The capital would help accelerate Acme's ability to replace the aerial fleet with Hitachi-branded excavators and wheel loaders. Or so Weld thought.

65.     Before approving the sale, HCM requested that Acme propose how it would go forward without its core business generating cash flow. In response to HCM's request, Acme prepared a four-year business plan (the "4 Year Plan") showing that Acme would re-fleet by spending a significant portion of the URI sale proceeds to acquire Illinois Truck, a desired target Acme identified in the March 2018 business plan, and an equal portion to purchase Hitachi-branded equipment. HCM approved the sale on that basis.

66.    The URI sale made the acquisition of Illinois Truck, discussed with and delayed by HCM several times since 2018, critical. After selling its core Aerial Lift Business to URI, Acme would need equipment it could rent out as soon as possible. HCM was aware that Acme intended to obtain that equipment by purchasing Illinois Truck and HCM-branded equipment. With the Deere JV still in place, Acme expected to purchase wheel loaders from HCMA's dealer network and excavators from John Deere dealers.

67.    While HCM was interested in the premium URI was willing to pay for the Aerial Lift Business, HCM tried to condition its approval on Weld and WH agreeing to reduce the purchase prices for the second and third tranches. When Weld and WH rejected HCM's demand, HCM agreed to approve the URI sale as long as the net profit not be included in Acme's EBITDA at year end for the purposes of calculating the purchase price for the Second Tranche. HCM also agreed that WH's pro rata share of the net profit would be distributed to WH upon completion of the URI sale.

68.    Thus, on June 29, 2021 the parties executed a second memorandum of understanding (the "Second MOU"). In the Second MOU, HCM and WH agreed that the gain on sale to URI ("Gain on Sale") would be distributed to WH based on WH's 2/3 interest in Acme, "notwithstanding anything in the Operating Agreement to the contrary and in addition to any other amounts distributable to the members in accordance with the Operating Agreement."

69.    The Second MOU also stated that "[s]uch distribution of proceeds shall be made as soon as the completion of all URI Transaction, subject to that the procedure and distribution of tax shall be further discussed and agreed by the Parties. The balance of the proceeds remaining after such portion of the Gain on Sale has been distributed to Weld Holdco shall be used as shall be further discussed and agreed by the Parties."

70.     The Second MOU contained the above provisions so that the Gain on Sale would not be included in Acme's Normalized EBITDA for the period ending December 31, 2021. By removing the Gain on Sale from the Normalized EBITDA, the Second MOU would necessarily reduce HCM's purchase price for the Second Tranche under the EPA. Although Weld saw the URI sale as an opportunity for Acme to utilize the sale proceeds to fund future acquisitions and operations and proposed to do so, HCM conditioned its approval of the URI sale on removing the Gain on Sale from the company's EBITDA to depress the purchase price for the Second Tranche.

71.     URI required Acme, Weld, and HCM's investment vehicle to agree to a non-competition agreement (the "URI Non-Competition Agreement") before purchasing Acme's aerial fleet and rental business. Since Acme was primarily known for renting aerial equipment, URI wanted to ensure it could purchase that business from Acme without Acme then re-fleeting with more aerial equipment and immediately competing with URI.

72.     The URI Non-Competition Agreement prohibited Acme and its affiliates, for a period of five years, from engaging in the business—the re-rental of aerial equipment—and any "Similar Business" that was substantially similar to that business or competitive to any reasonable extent. However, the URI Non-Competition Agreement specifically permitted Acme to engage in retail and whole rental of "all earthmoving equipment, wheel loaders, excavators and related accessories." It also specifically permitted Weld, if he were no longer affiliated with Acme, to engage in retail rental business of other types of construction equipment. This provision was included to address the fact that HCM would complete its purchase of Acme's equity during the five-year non-competition period.

73.     The URI Non-Competition Agreement also acknowledged that Acme had "the means to support itself and its Affiliates [. . .] other than by engaging in a Similar Business," and

that the Non-Competition Agreement would not impair Acme's ability to support itself. For Acme, the URI Sale and the URI Non-Competition Agreement were approved by unanimous written consent of Acme's board of managers, including the managers appointed by HCM.

74.    Takuya Kawamoto, believed to be an HCM officer, signed the URI Non-Competition Agreement on behalf of HCM's investment vehicle.

### C.    The Deere JV Ends and HCM Unilaterally Changes the Business Plan Again

75.    With HCM's approval of the URI sale, Weld and Acme sought to move forward with the previously contemplated purchase of Illinois Truck and the new Hitachi equipment and submitted repeated requests to HCM for approval.

76.    On August 19, 2021, HCM publicly announced that it was ending its joint venture with John Deere. Acme and Weld learned about the end of the Deere JV on the same day the general public did. No longer constrained by the joint venture agreement with Deere, HCM fundamentally changed its approach to the North American market and its relationship with Acme and Weld.

77.    As Senzaki would subsequently write to Weld "HCMA [the American subsidiary of authorized dealers that was prohibited from competing with Acme] is in the process of being reborn as a company that controls HCM's new North, Central and South America business" and Hitachi's earth moving equipment would go to them, not Acme, because "the supply capacity of Global HCM and of its business partners is not so large."

78.    In announcing the end of the Deere JV, HCM stated that it intended to manufacture all its excavators, wheel loaders and mining equipment in Japan and then import them to the North and South American markets. HCMA would expand its dealership network from the

approximately 60 wheel loader dealers it had and begin distributing HCM excavators through this expanded network.

79.    In September 2021, HCM's unilateral actions prevented Acme from achieving the latest approved business plan for the third time in violation of Sections 8.10(t) and 8.13(d) of the LLC Agreement—this time, the four-year business plan HCM and Acme's board of managers approved a few months earlier in connection with HCM's approval of the URI deal.

80.    After having kept Weld and Acme in the dark about the impending end of the Deere JV when it approved the URI deal and entered into the Second MOU, HCM refused to permit Weld to proceed with the Illinois Truck acquisition and told him instead to delay it. On September 27, 2021, Illinois Truck informed Weld that they had found another buyer and would be moving forward with that sale rather than waiting for Hitachi.

**D.    HCMA Directly Competes Against Acme as Early as 2020 and, the End of the Deere JV, HCM Uses HCMA Instead of Acme to Grow Market Share in North America**

81.    HCM repeatedly breached the Section 5.12(c) of the EPA in two ways. First, in 2020, HCM's wholly owned subsidiary, HCMA approached Ahern Rental, one of the largest rental companies in the United States and, historically, Acme's biggest customer by revenue. HCMA offered a particular deal to Ahern: if Ahern purchased one piece of equipment, HCMA would rent to them a second piece that Ahern could re-rent out. HCMA and Ahern would then split any rental revenue from the second machine on a 50/50 basis.

82.    HCMA's deal with Ahern directly interfered with Acme's relationship with Ahern. On equipment Acme rented to Ahern, the revenue was typically split with Ahern taking 20% and Acme receiving 80%. After receiving HCMA's offer, Ahern unilaterally changed the rental split

27

and reduced Acme's portion to 70%. Given the size of Ahern's account, this significantly reduced the amount of revenue Acme received from Ahern.

83.    On January 2, 2020, Weld informed HCM that HCMA had materially damaged Weld's and Acme's relationship with Ahern, likely costing Acme tens of millions of dollars in profits over the next ten years. On January 15, 2020, HCM employee Nobuhiro Akamatsu replied to Weld's letter about HCMA interference with Acme's relationship with Ahern:

> I sincerely apologize for our lack of communication to you regarding this deal [Ahern].
> We should have paid more considerations to our strategic partnership and common interests with you and ACME.
> As you mentioned, I did not know in detail about this deal.
> HCMA told me that they would like to meet with you to directly apologize….

84.    Second, in October 2021, HCM presented its new "North American Distribution Strategy Overview" to Acme after terminating the Deere JV. At that meeting, HCM's Chief Operating Officer and President of Corporate Strategy, Masafumi Senzaki told Weld and Acme that HCMA would be providing wheel loaders and excavators directly to "wide area rental companies" and new Hitachi dealers. The wide area rental companies are Acme's traditional customers, and HCM's decision to provide equipment directly to them violated the EPA's prohibition on engaging in or operating a business that "otherwise provided construction equipment to any Person that is in the business of renting, leasing or otherwise providing such construction equipment to end-users." That is, HCMA would sell equipment to Acme's customers who would have otherwise rented that equipment from Acme.

85.    As part of its new strategy, HCM stated it would not allow Acme to acquire other rental companies—despite this having been a key part of the agreed business plans from the beginning—and that HCM's "current top priority" was to build a "Top tier dealer network." HCM

further informed Acme that HCMA would "lead" the "collaboration" between Acme and the dealers to satisfy rental customers and that "[a]ny other potential actions to be discussed between HCMA and Acme." HCM also informed Acme that it planned to prioritize supplying HCMA dealers with the equipment HCM had previously committed to supply to Acme to re-fleet, stating: "Difficult to satisfy new machine requirement from all group due to production capacity in FY 2022." HCM's actions left Acme with no way to re-fleet after having sold its core business to URI with HCM's approval. In addition to shutting Acme off from access to HCM equipment to re-fleet, HCMA renting directly to Acme's customers mean that HCM was diverting revenue away from Acme to HCM, causing a direct loss of EBITDA to Acme and, in turn, to the value of Weld's equity interest in Acme.

86.     HCM imposed this new strategy on Acme unilaterally and in violation of the LLC Agreement's requirement for the officers of the company to develop and approve a business plan for Acme, violating the HCM-approved existing business plan in several ways.

### a.     HCM Tries to Retrade Again to Undo the Second MOU

87.     On October 13, 2021, a day after the meeting at which HCM's new strategy was presented, Motohiro Narao emailed Charles Snyder, a consultant who had worked on the original investment, and tried to renegotiate the Second MOU. Narao proposed that WH agree to not take the distribution of Gain on Sale from the URI deal specified in the Second MOU, and that the purchase price for the Second Tranche include the gross profit from the URI deal. This would have undone the Second MOU that HCM had agreed to just two months earlier—prior to selling Acme's aerial lift fleet.

88.      In this email exchange, Narao admitted that HCM reached the agreement to end the Deere JV at the same time that HCM consented to the URI sale. Narao further stated that "some

people in Hitachi" believed Acme's wholesale rental business was "not necessary, and if possible, give up." Narao said that the end of the Deere JV made it difficult for HCM to proceed with the Second Tranche even if the agreed distribution to WH from the Gain on Sale instead remained in Acme.

89.     In another email, Narao rejected the idea of Weld re-purchasing Hitachi's interest in Acme if HCM did not purchase the Second Tranche. He wrote, "Of course Hitachi do not want to sell back, which we have to avoid such kind of tragedy. Hitachi needs the time because we have to focus on the dealer development. We do not have enough resources to enter this rental field activities."

90.     In short, HCM knew that its strategy in North America would fundamentally change after the end of the Deere JV when it approved the URI deal, gutting Acme's legacy business. HCM also knew that it planned to focus its resources on building its dealer network through HCMA and that it did not have the resources (or the intention) to supply both a new dealer network and Acme. Unlike Acme, HCM knew all of this and still consented to the URI sale.

**b.    Acme Tries to Purchase New Equipment from HCMA to No Avail**

91.     With HCM preventing any acquisitions of retail rental outlets, Acme tried to use approximately $180 million from the URI sale to purchase new equipment from HCMA. On October 20, 2021, Acme attempted to do so, sending purchase orders to HCMA seeking to buy 480 new excavators. Acme requested the excavators be delivered over the first three quarters of 2022. Acme also sent HCMA purchase orders for 404 wheel loaders in models of varying sizes to be delivered over the first three quarters of 2022.

92.     HCMA rejected the purchase orders and demanded that Acme provide proof of HCM's consent to Acme's capital expenditure for the purchases.

        **c.**    <u>**HCM Does Not Purchase the Second Tranche**</u>

93.     At the end of November 2021, however, HCM notified Weld that it was unlikely to exercise its option to buy the Second Tranche and formalized that decision at HCM's board meeting on December 23, 2021.

94.     Over the next several months, HCM and Weld continued to negotiate next steps. Several times during this period, HCM demanded and summarily rejected business plans produced by Acme.

95.     In January 2022, Narao emailed Acme rejecting one business plan and stating "My understanding is the lack of fleet is the reason Acme cannot generate enough revenue to stand alone. Please add fleet ASAP so that the eventual exit can occur much sooner. Fleet up, reduce debt and improve the entity value as soon as possible is HCM's desire." Again, Acme lacked the ability to execute HCM's directive to "fleet up" due to HCM's actions, specifically HCM's blanket prohibition on Acme acquisitions, including Illinois Truck, and HCM's refusal to sell excavators to Acme.

96.     By February 2022, Narao described HCM's position as "just exit from ACME with payback of our first investment according to our agreement. However, we think that this is not realistic so that we are not discussing the smooth transition or ACME restart."

97.     Later that month, Senzaki wrote to Weld and WH stating that "HCM thinks it unnecessary to terminate the EPA in full, but to amend part of it to accommodate with non-exercise of 2nd Tranche." He then tried to renegotiate both the Second MOU and the EPA. Senzaki demanded that Weld reduce the maximum amount of funds distributable from the URI sale and that funds be distributed to both Weld and HCM on a pro rata basis.

98.     Senzaki also demanded that the repurchase price as defined in the EPA be changed to the greater of $35 million or "calculation based on enterprise value. If you managed to sell HCM portion at a higher price to a third-party within 6 months from the repurchase, we will ask to repay the gain." This is contrary to the terms of the EPA.

99.     Senzaki also threatened HCM's guarantees of Acme debt, writing:

> HCM's guarantee can be maintained when the business performance aligns with the business plan. But we will need to revise the guarantee if the business underperforms the business plan. So we can only extend the guarantee year on year basis. If the business underperforms and will face negative net worth, then we cannot continue the guarantee. If this case happens, Woody-san will need to avoid it at your own risk. If you can avoid the situation, we will continue to provide guarantee. On the other hand, if any distributable profit is made from the business, such profit will be distributed pro-rata with Weld and HCM based on interest share ratio.

100.    Indeed, until this point, HCM had been providing guarantees to the banks, as required under Section 5.09 of the LLC Agreement and other Transaction Documents, on a year-to-year basis. Acme's loans with MUFG, for example, were regularly extended by one year each March. In March 2022, however, HCM refused to provide a guarantee for the next year. Rather, it guaranteed Acme's $220 million uncommitted credit facility with MUFG for only one month.

101.    In April, HCM extended its guarantee to the end of June. And in June, it extended its guarantee to the end of August. At the end of August, HCM extended its guarantee for another two months—to the end of October 2022. Each time, the credit facility agreement was amended to extend the loan.

## IV.    HCM BREACHES THE TRANSACTION DOCUMENTS AND WITHDRAWS ITS GUARANTEES OF ACME'S DEBT IN BAD FAITH

102.    From the end of October through the beginning of December 2022, in breach of the Transaction Documents, HCM refused to extend its guarantees knowing Acme did not have the funds to immediately repay the principal in full. Thus, when HCM refused to extend its Letters of

Guaranty with its preferred lenders, the banks called the loans. Despite HCM's bad faith refusal to approve any acquisitions or the business plans Acme tried to implement, Acme had been timely making the required, scheduled interest and principal payments under the loan documents. Acme would have been able to continue making the necessary payments if HCM had not withdrawn its Letters of Guaranty.

103.    HCM withdrew its Letters of Guaranty despite its obligation in the LLC Agreement to guarantee Acme's obligations. And instead of using its reasonable best efforts to obtain debt financing for Acme, as required by the LLC Agreement, HCM withdrew its Letters of Guaranty and triggered the alleged defaults with all of Acme's lenders.

104.    HCM has asserted that it fully paid off all the loans, which appear to have been coordinated with its refusal to extend the guarantees, just one day after receiving a demand for payment from MUFG.

105.    Each of Acme's other lenders, including those with loans that were performing (and some with maturities years in the future), accelerated their loans either because HCM refused to extend its guarantees to the lenders or due to cross-default provisions in the loan agreements.

106.    SMBC had provided the $108 million loan for the purchase of Ecco in October 2019, and its loan to Acme was renewed in October 2020 and October 2021. The SMBC loan agreement also required a letter of guarantee from HCM as a condition precedent and made it an event of default if HCM's letter of guarantee "expires without renewal, disclaimed or disavowed, or, in the case of a guarantee, ceases to be the valid, binding and enforceable obligation of the guarantor thereunder."

107.    HCM refused to renew its letter of guarantee to SMBC at the end of October 2022 and thus caused Acme's alleged default under the SMBC loan agreement.

108.    MHC notified Acme on November 16, 2022 that Acme had allegedly defaulted on MHC's loans by failing to pay the loans owing to MUFG.

109.    SMFL notified Acme on December 5, 2022 that Acme had allegedly defaulted on SMFL's secured loans under the cross-default provisions of the loan agreement.

110.    HCM's decision to not renew its guarantee created a cascade of alleged defaults. HCM claims it was somehow prepared to immediately pay off the loans.

111.    The SMFL default notice demanded payment within 10 days of December 5, 2022. HCM alleges here that it paid off the loan on December 6, 2022, and that SMFL assigned its rights under the loan to HCM on the same day.

112.    The SMFL loans were secured by Acme equipment. HCM sent notices to Acme and Weld on December 19, 2022, December 27, 2022, and January 10, 2023 purporting to set public auctions for the secured equipment. According to these notices, auctions were to take place on January 19, 2023 and February 9, 2023. Acme requested the amounts owing under such loans on multiple occasions so Acme could exercise its redemption rights prior to the sales but HCM refused in violation of, among other things, Section 9-623 of the Uniform Commercial Code.

113.    HCM held these auctions and, with no bidders aside from HCM, allegedly purchased the collateral, worth tens of millions of dollars, for $2,000.

## **AFFIRMATIVE DEFENSES**

Defendants assert the following affirmative defenses. In asserting these defenses, Defendants do not assume the burden of establishing any fact or proposition where that burden is properly imposed on Plaintiff. Defendants expressly reserve the right to supplement, amend or

delete any or all of the following defenses, as warranted by discovery or other investigation, or as justice may require.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

The Complaint fails, in whole or in part, to state a claim upon which relief can be granted.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

Plaintiff is estopped by its own inequitable conduct from asserting the claim that is at issue in the Complaint.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

Plaintiff waived the claims that are at issue in the Complaint.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claim is barred, in whole or in part, by the doctrine of laches.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claim is barred, in whole or in part, by the doctrine of unclean hands.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

At all times relevant to the Complaint's allegations, Defendants acted in good faith and in reliance on the promises made express and implied, in the Transaction Documents.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claim is barred on account of its first breach, and continuing breaches, of the express terms of Transaction Documents, as well as the covenant of good faith and fair dealing implied in the Transaction Documents.

## AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claim is barred in whole or in part by its own inequitable conduct in engineering the alleged default with Acme's lenders.

**AS AND FOR A NINTH AFFIRMATIVE DEFENSE**

Plaintiff, by its own conduct caused or contributed, in whole or in part, to the damages it claims in the Complaint.

**AS AND FOR A TENTH AFFIRMATIVE DEFENSE**

Plaintiff's claim is barred, either in whole or in part, by its failure to mitigate.

**AS AND FOR AN ELEVENTH AFFIRMATIVE DEFENSE**

Plaintiff has not suffered, and will not suffer, injury or damages as a result of any conduct by Defendants, and therefore is barred from maintaining this action.

**JURY DEMAND**

Defendants hereby demand a trial by jury.

WHEREFORE, Defendants pray for judgment as follows:

1.      For a judgment and decree dismissing the Complaint with prejudice;

2.      For a judgment and decree awarding Defendants costs, including attorneys' fees and expenses;

3.      For such other and further relief as the Court deems just and proper under the circumstances.

Dated: New York, New York
       March 30, 2023

                                        AMINI LLC


                                        By: /s *Bijan Amini*
                                            Bijan Amini
                                            Lita Beth Wright
                                            Reece C. Dameron
                                        131 West 35th Street, 12th Floor
                                        New York, New York 10001
                                        (212) 490-4700
                                        bamini@aminillc.com

36

lbwright@aminillc.com
rdameron@aminillc.com

*Attorneys for Defendants Woodrow Weld
and Weld Holdco, LLC*