UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
HITACHI CONSTRUCTION MACHINERY
CO., LTD, a Japanese
Corporation,

           Plaintiff,

     - against –               23 Civ. 490 (NRB)

WELD HOLDCO, LLC, a Delaware
Limited Liability Company, and
WOODROW D. WELD, an individual,

          Defendants.
------------------------------X
------------------------------X       **MEMORANDUM AND ORDER**
HITACHI CONSTRUCTION MACHINERY
CO., LTD, a Japanese
Corporation,

           Plaintiff,

     - against –             23 Civ. 1396 (NRB)

ACME BUSINESS HOLDCO, LLC, ACME
LIFT COMPANY, LLC, ECCO
EQUIPMENT COMPANY, LLC, WELD
HOLDCO, LLC, and WOODROW D.
WELD, an individual,

          Defendants.
------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    These two actions arise from the default on numerous loans

which required plaintiff Hitachi Construction Machinery Co., Ltd.

("plaintiff" or "Hitachi") as guarantor to pay $384 million to

four different lenders.   In the first of these actions, the

"Guarantee Action" (No. 23 Civ. 490), Hitachi alleges that Woodrow

D. Weld ("Weld") and Weld Holdco, LLC ("Weld Holdco" and together with Weld, the "Weld defendants") violated a cross-guarantee agreement that obligated them to shoulder a substantial portion of the $384 million default payment.  See ECF No. 1 ("Guarantee Compl.").  In the second action, the "Subrogation Action" (No. 23 Civ. 1396), Hitachi invokes the common law right of equitable subrogation (i.e., to stand in the shoes of the lenders) and asserts various claims on behalf of the lenders whose loans Hitachi guaranteed, including a fraudulent transfer claim against the Weld defendants.  See ECF No. 38-1 ("Subrogation Am. Compl.").

Nearly five months after Hitachi initiated the Guarantee Action, the Weld defendants filed an arbitration demand against Hitachi and two of its subsidiaries.  Subsequently, the Weld defendants filed a motion in both the Guarantee and Subrogation Actions to compel arbitration and stay litigation pending arbitration.  Guarantee Action ECF No. 35; Subrogation Action ECF No. 60.  The Weld defendants also filed a motion in the Subrogation Action to dismiss Hitachi's fraudulent transfer claim for lack of personal jurisdiction.  ECF No. 53.  For its part, Hitachi filed a motion in the Guarantee Action to strike the Weld defendants' affirmative defenses and dismiss their counterclaims.  ECF No. 48. These three motions are addressed in this decision.

For the reasons set forth below, the Weld defendants' motion to compel arbitration and stay litigation is granted in part and denied in part.  Further, because the Court finds that Hitachi is required to arbitrate its fraudulent transfer claim, the Weld defendants' motion to dismiss that claim for lack of personal jurisdiction is denied as moot.  Finally, Hitachi's motion to strike the Weld defendants' affirmative defenses and dismiss their counterclaims is granted in full.

**BACKGROUND**

## I.   The Parties

Hitachi is a large Japanese corporation.  Guarantee Compl. ¶ 2.  Though not a party here, Hitachi Construction Machinery Investment U.S.A. Corporation ("HIUS") is a wholly owned subsidiary of Hitachi and a successor to Hitachi Construction Machinery Corporation ("HHUS").  Id. ¶¶ 9-10.

Between 2017 and 2018, Hitachi expressed interest in acquiring some part of Acme Business Holdco, LLC ("Acme"), a business engaged in the wholesale rental of construction equipment.  Id. ¶¶ 1, 10.[1]  At the time, Acme was wholly owned by

---

[1] Any reference to Acme also includes its wholly owned subsidiaries Acme Lift Company, LLC and ECCO Equipment Company, LLC.

the Weld defendants.  Declaration of Benjamin A. Taylor ("Taylor Decl."), Ex. 9 (Equity Purchase Agreement) at 1.

## II.  The Relevant Agreements

On March 12, 2018, HHUS and the Weld defendants entered into the Equity Purchase Agreement (the "EPA").  Id.  Under the EPA, Hitachi's subsidiary HHUS (now HIUS) purchased 33 1/3 percent of Acme's common units from the Weld defendants.  Id.  As a result, Hitachi owns 33 1/3 percent of Acme's common units through HIUS, and Weld Holdco owns the remaining 66 2/3 percent.  Guarantee Compl. ¶ 10.  Relevant here, the EPA contains an arbitration provision, which provides that "any dispute arising out of or relating to this Agreement or any of the Transaction Documents . . . . shall be settled by binding arbitration in New York before one arbitrator" and be "administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures."  EPA § 11.13(a)-(b).[2]

On the same day, HHUS, Weld Holdco, and Acme entered into the LLC Agreement.  Taylor Decl., Ex. 8 (LLC Agreement) at 1.  The LLC

---

[2] The EPA defines "Transaction Documents" as including, in relevant part, the EPA itself, the LLC Agreement, and "each other agreement, document, instrument and/or certificate contemplated by [the EPA] to be executed in connection with the transactions contemplated hereby."  EPA at 73.

Agreement, which is Acme's operating agreement, also contains an arbitration provision requiring that "any controversy, claim or dispute arising out of or based upon this Agreement [or] the transactions contemplated hereby [be] settled by binding arbitration in New York before one arbitrator" and be "administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures." Id. § 17.14.

The following day, on March 13, 2018, Hitachi entered into two agreements on its own behalf: (1) the Guarantee Agreement with the Weld defendants; and (2) the Guarantee Fee Agreement with Acme. Under the Guarantee Agreement, Hitachi received a cross-guarantee from the Weld defendants in an amount equal to their equity ownership percentage in Acme for a $220 million loan made to Acme that Hitachi had agreed to guarantee in full. EPA, Ex. B (Guarantee Agreement) at 1. Under the Guarantee Fee Agreement, Acme was required to pay Hitachi a semiannual fee in exchange for its guaranteeing the full amount of the $220 million loan. EPA, Ex. C (Guarantee Fee Agreement) at Art. 2. These guarantee agreements contain an identical forum selection clause, which states that "[a]ny legal action based on, related to and/or regarding this Guarantee shall be brought in any federal or state courts sitting in New York, New York, and the parties submit to

their exclusive jurisdiction." Guarantee Agreement § 14;
Guarantee Fee Agreement at 3.

Since March 2018, Acme has borrowed money under, or is a party
to, numerous credit facilities and loan agreements with four
lenders, all of which are guaranteed by Hitachi. Guarantee Compl.
¶ 11. On June 30, 2022, more than four years after the EPA and
LLC Agreement were executed, Hitachi and the Weld defendants
entered into the Master Cross Guarantee Agreement (the "Cross
Guarantee"), which identifies at least eighteen credit instruments
under which Acme borrowed funds and that Hitachi guaranteed (the
"Existing Loans"). Id. ¶¶ 12-13; Taylor Decl. Ex. 14 (Cross
Guarantee) at 2. Pursuant to the Cross Guarantee, the Weld
defendants agreed to cross-guarantee the Existing Loans to "ensure
that [the Weld defendants] would contribute their pro-rata share
of the financial risk associated with [Hitachi's] guarantees upon
a default" on those loans. Guarantee Compl. ¶ 1; Cross Guarantee
at 2. Specifically, the Weld defendants agreed to:

> [U]nconditionally, absolutely and irrevocably guarantee to
> [Hitachi] the full and prompt payment and performance when
> due . . . of its Equity Ownership Percentage of any guarantee
> payment, including, without limitation, those obligations
> arising under the Existing Loans . . . , and all agreements,
> instruments and documents evidencing, guarantying, securing
> or otherwise executed in connection with any of the foregoing
> . . . (collectively, the 'Weld Obligations').

Cross Guarantee ¶ 1.[3]  Additionally, the Weld defendants agreed to waive all defenses and counterclaims as to the "lack of validity" or "enforceability" of any agreements relating to the Weld Obligations.  Id. ¶ 7.  In relevant part, the Cross Guarantee provides:

> Weld and [Weld Holdco] specifically waive all defense[s], counterclaims and off-sets of any kind or nature, whether legal or equitable, that may arise . . . directly or indirectly from the present or future lack of validity, binding effect or enforceability of the Existing Loans or any other document or instrument evidencing, securing, or otherwise relating to the Weld Obligations[.]

Id.

Furthermore, the Cross Guarantee contains an identical forum selection clause to the one contained in the Guarantee Agreement and Guarantee Fee Agreement, which specifies that "[a]ny legal action based on, related to and/or regarding this Guarantee Agreement shall be brought in any federal or state court sitting in New York, New York."  Id. ¶ 18.  Moreover, the Cross Guarantee is governed by New York law.  Id. ¶ 17.

---

[3] Hitachi's obligations to the Weld defendants under the Cross Guarantee are identical to the Weld defendants' obligations to Hitachi.  Cross Guarantee ¶ 2.

### III. Procedural History

#### A. The Guarantee Action

In January 2023, Hitachi sued the Weld defendants asserting only one claim: breach of the Cross Guarantee.  Guarantee Compl. ¶¶ 38-43.  Hitachi brought the Guarantee Action after Acme defaulted on the Existing Loans and Hitachi was obligated to pay $384 million as the guarantor of those loans.  Id. ¶¶ 20-33.  Under the Cross Guarantee, the Weld defendants were required to pay their cross-guarantee obligations to Hitachi within five business days of the receipt of written notice.  Id. ¶ 35; Cross Guarantee ¶ 13.  Hitachi claims that despite receiving such notice, the Weld defendants failed to pay any and all amounts owed to Hitachi and thereby violated the Cross Guarantee.  Guarantee Compl. ¶¶ 34-37.

#### B. The Subrogation Action

In February 2023, Hitachi brought another suit invoking the "common law right of equitable subrogation" arising out of the same $384 million payment it made as Acme's guarantor.  Subrogation Am. Compl. ¶ 1.  In the Subrogation Action, Hitachi asserts seven claims purportedly "stand[ing] in the shoes" of Acme's four lenders: (1) four breach of contract claims against Acme -- one on behalf of each lender -- for defaulting on the loans and thus

violating the relevant loan agreements;[4] (2) one fraudulent conveyance claim against the Weld defendants; and (3) replevin and conversion claims against Acme relating to construction equipment used as collateral for the loans.  Id. ¶¶ 63-112.[5]

**C. The Weld Defendants' Response**

On March 30, 2023, the Weld defendants filed an answer in the Guarantee Action in which they asserted eleven affirmative defenses, including (1) unclean hands; (2) that Hitachi breached its own relevant contractual agreements; and (3) that Hitachi's claim is barred "by its own inequitable conduct in engineering the alleged default with Acme's lenders."  ECF No. 19 at 34-35.  In support of their affirmative defenses, the Weld defendants alleged an intricate theory under which they claim that Hitachi orchestrated and triggered the defaults of Acme's loans in order to seize control of the remaining portion of Acme without paying the bargained-for price.  See, e.g., id. at 5-9.  Notably, none of

_____

[4] All the loan agreements on which Hitachi's breach of contract claims are based provide for jurisdiction in the state and federal courts of New York, New York.  See Declaration of Peter C. Meier ("Meier Decl."), Ex. 2, at 21; id. Ex. 3, at 12-13; id. Ex. 4, at 26-27; id., Ex. 5, at 10.
[5] Hitachi asserts an eighth claim for "injunctive relief," but "[i]t is well settled that a request for . . . injunctive relief is not an independent cause of action," but rather "the remedy sought for the legal wrongs alleged in the . . . substantive counts."  Budhani v. Monster Energy Co., 527 F. Supp. 3d 667, 688 (S.D.N.Y. 2021).

the Weld defendants' defenses mentioned the arbitrability of any Hitachi's claims.

Also on March 30, 2023, the Weld defendants filed a pre-motion letter in the Subrogation Action proposing a motion to dismiss the fraudulent conveyance claim for lack of personal jurisdiction and for failure to state a claim upon which relief can be granted. ECF No. 28. There, too, the Weld defendants made no mention of their intention to arbitrate.

**D. The Weld Defendants' Arbitration Demand**

On May 12, 2023, nearly five months after the Guarantee Action was filed, the Weld defendants mentioned their intent to seek arbitration for the first time. Guarantee Action ECF No. 20; Subrogation Action ECF No. 33 (Joint Case Management Plan) at 5-6. Specifically, the Weld defendants argued in their portion of the Joint Case Management Plan that their "affirmative claims against [Hitachi]" as well as Hitachi's claims against them are subject to arbitration. Id. at 5-6.[6] However, the Weld defendants also represented that they "are amenable to litigating their

---

[6] At the time the Joint Case Management Plan was filed, the Weld defendants had not filed any counterclaims or an arbitration demand, and thus their only "affirmative claims" were the affirmative defenses they had asserted in the Guarantee Action.

-10-

affirmative claims against [Hitachi] here, or in arbitration, as long as all claims arising under or relating to the Transaction Documents [as defined by the EPA] are heard in one forum." Id. at 6.

On May 22, 2023, the Weld defendants filed a pre-motion letter in both actions arguing that the Court should stay the litigation pending an arbitration they intended to file against Hitachi and its subsidiaries. Guarantee Action ECF No. 23; Subrogation Action ECF No. 35. Hitachi filed a response in opposition to the Weld defendants' proposed motion. Guarantee Action ECF No. 28; Subrogation Action ECF No. 44.

On June 9, 2023, the Weld defendants filed an arbitration demand with JAMS in New York, asserting ten claims against Hitachi and its subsidiaries, including (1) violation of 18 U.S.C. §§ 1962(b) and (c) ("RICO"); (2) fraud in the inducement; (3) breach of contract; (4) breach of the implied covenant of good faith and fair dealing; and (5) tortious interference with contract. Guarantee Action ECF No. 29-1; Subrogation Action ECF No. 46-1 ¶¶ 150-288.[7] These claims are predicated on the same

---

[7] There is no dispute that Hitachi's subsidiaries must participate in the arbitration that the Weld defendants filed. See Guarantee Action ECF No. 39; Subrogation Action ECF No. 68 (Hitachi Arbitration Opp.) at 3 n.1 (citing Taylor Decl., Ex. 26). Hitachi, however, objects to and has declined to participate

theory that the Weld defendants had already alleged in support of their affirmative defenses in the Guarantee Action.

## E. The Weld Defendants' Counterclaims

On June 26, 2023, the Weld defendants filed an amended answer in the Guarantee Action asserting eleven affirmative defenses and, for the first time, counterclaims against Hitachi, essentially repeating the allegations contained in their arbitration demand filed just weeks prior.  ECF No. 32 ("Am. Answer").

As alleged, the Weld defendants' affirmative defenses are: (1) Hitachi's claims are subject to arbitration; (2) failure to state a claim for relief; (3) estoppel; (4) unclean hands; (5) the Weld defendants "acted in good faith and in reliance on the promises made express and implied" in the relevant agreements; (6) Hitachi's claim is barred by its own breach of contractual duties, good faith and fair dealing, or tortious interference with contract; (7) Hitachi's "inequitable conduct in engineering the alleged default with [Acme's] lenders"; (8) Hitachi's conduct caused or contributed to its own damages; (9) failure to mitigate; (10) fraudulent inducement; and (11) that Hitachi's wrongful

---

in the pending arbitration.  <u>See</u> Guarantee Action ECF No. 36; ECF No. 61 (Weld Defendants' Arbitration Mot.) at 2.

conduct caused the defaults and caused the lenders to demand payment of Hitachi's guarantees.  Id. ¶¶ 217-27.

The Weld defendants also assert six counterclaims, which closely track the claims asserted in their arbitration demand: (1) RICO violations; (2) fraud in the inducement; (3) breach of contract; (4) two tortious interference claims; and (5) breach of the implied covenant of good faith and fair dealing.  Id. ¶¶ 229-332.

## F. The Instant Motions

On July 6, 2023, the Weld defendants filed a motion in both actions to compel arbitration and for a stay of litigation pending arbitration.  Guarantee Action ECF Nos. 35-38; Subrogation Action ECF Nos. 60-63.[8]  At about the same time, the Weld defendants filed a motion to dismiss Hitachi's fraudulent transfer claim in the Subrogation Action for lack of personal jurisdiction.  ECF Nos. 53-55.[9]  Finally, on August 24, 2023, Hitachi filed a motion to

---

[8] On July 20, 2023, Hitachi opposed the Weld defendants' arbitration motion, Guarantee Action ECF Nos. 39-40; Subrogation Action ECF Nos. 68-69, and the Weld defendants filed a reply in support of their motion on July 27, 2023, Guarantee Action ECF Nos. 42-43; Subrogation Action ECF Nos. 71-72.  Each party subsequently filed sur-replies concerning the arbitration motion.  Guarantee Action ECF Nos. 68, 74; Subrogation Action ECF Nos. 76, 92, 99.

[9] On July 7, 2023, Hitachi opposed the Weld defendants' personal jurisdiction motion, ECF Nos. 64-65, and the Weld defendants filed a reply in support of their motion on July 14, 2023, ECF Nos. 66-67.

strike the Weld defendants' affirmative defenses and dismiss their counterclaims in the Guarantee Action.  ECF Nos. 48-50.[10]  These three motions will be discussed in turn.[11]

## DISCUSSION

## I. Motion to Compel Arbitration[12]

### A. Legal Standard

The Federal Arbitration Act ("FAA") "embod[ies] [a] national policy favoring arbitration."  Nicosia v. Amazon.com, Inc., 834 F.3d 220, 228 (2d Cir. 2016).  "This policy is founded on a desire to preserve the parties' ability to agree to arbitrate, rather

---

[10] On September 21, 2023, the Weld defendants opposed Hitachi's motion, ECF Nos. 58-50, and Hitachi filed a reply in support of its motion on September 28, 2023, ECF No. 62.

[11] Despite these pending motions, the Weld defendants have engaged in pre-trial discovery, including by serving (1) initial disclosures in the Subrogation Action, Meier Decl., Ex. 7; (2) 44 document requests on Hitachi in the Guarantee Action, id., Ex. 8; (3) 47 document requests on Hitachi in the Subrogation Action, id., Ex. 9; (4) 48 document demands across four third-party subpoenas in the Subrogation Action, id., Exs. 11-14; and (5) additional document requests on Hitachi in both actions, id., Exs. 15-16.

[12] Hitachi's cursory argument that the Weld defendants have waived their right to demand arbitration lacks merit. Opp. at 22.  The Second Circuit has generally found that a party waives its right to arbitrate "when it engages in protracted litigation," such as "extensive pre-trial discovery" and "substantive motions" over the course of several months before seeking arbitration.  PPG Indus., Inc. v. Webster Auto Parts Inc., 128 F.3d 103, 107-08 (2d Cir. 1997).  However, the Weld defendants have not filed any "substantive motions" in either action, and although they have engaged in some discovery, it has not been so "extensive" such that it would support a finding of waiver.  Id.  Moreover, it bears mentioning that the Weld defendants' engagement in discovery inures to Hitachi's benefit because the litigation that Hitachi initiated has continued to progress despite the instant motions.

-14-

than litigate, disputes." Id. at 229 (alteration omitted).  "But the FAA does not require parties to arbitrate when they have not agreed to do so."  Id. (internal quotations omitted); see also Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115, 126 (2d Cir. 2010) ("[A]rbitration is a matter of contract, and therefore a party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit.").

Courts in this circuit undertake a two-part inquiry to determine whether a particular dispute is subject to arbitration, assessing "(1) whether there exists a valid agreement to arbitrate at all under the contract in question . . . and if so, (2) whether the particular dispute sought to be arbitrated falls within the scope of the arbitration agreement."  Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001).

In adjudicating a motion to compel arbitration, "courts apply a standard similar to that applicable for a motion for summary judgment," considering "all relevant, admissible evidence submitted by the parties" and "draw[ing] all reasonable inferences in favor of the non-moving party."  Nicosia, 834 F.3d at 229 (internal quotations omitted).

-15-

**B. Judicial Determination of Arbitrability**

At the outset, the Court addresses the Weld defendants' argument that the question of whether this dispute is arbitrable is one for the arbitrator and not the Court to decide.  Mot. at 12-14.  This argument lacks merit.

"[T]he question whether parties have submitted a particular dispute to arbitration, _i.e.,_ the 'question of arbitrability,' is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise."  <u>Schneider v. Kingdom of Thailand</u>, 688 F.3d 68, 71 (2d Cir. 2012) (quoting <u>Howsam v. Dean Witter Reynolds, Inc.,</u> 537 U.S. 79, 83 (2002) (internal quotations omitted)).[13]

The Weld defendants assert that because the EPA and LLC Agreement expressly reference the JAMS Rules, the parties "clearly and unmistakably" provided that the issue of arbitrability is for the arbitrator.  Mot. at 12.[14]  It is correct that when "<u>the parties</u> explicitly incorporate procedural rules that empower an arbitrator to decide issues of arbitrability, that incorporation may serve as

---

[13] The question of arbitrability encompasses "disputes about whether the parties are bound by a given arbitration clause."  <u>Schneider</u>, 668 F.3d at 71 (internal quotations and alterations omitted).

[14] JAMS Rule 11(b) provides that "[j]urisdictional and arbitrability disputes, including disputes over . . . who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator."

clear and unmistakable evidence of <u>the parties</u>' intent to delegate arbitrability to an arbitrator." <u>DDK Hotels, LLC v. Williams-Sanoma, Inc.</u>, 6 F.4th 308, 318 (2d Cir. 2021) (internal quotations omitted) (emphases added). Critically, however, Hitachi is not a party to either the EPA or LLC Agreement. Therefore, the reference to the JAMS Rules in those agreements does not constitute clear and unmistakable consent on Hitachi's part to delegate the question of arbitrability to an arbitrator. <u>See</u> <u>Kwatinetz v. Mason</u>, 356 F. Supp. 3d 343, 347 (S.D.N.Y. 2018) (finding that reference to AAA rules that delegated the question of arbitrability to an arbitrator did not apply to a non-signatory); <u>McKenna Long & Aldridge, LLP v. Ironshore Specialty Ins. Co.</u>, Nos. 14 Civ. 6633(KBF), 14 Civ. 6675(KBF), 2015 WL 144190, at *5 (S.D.N.Y. Jan. 12, 2015) (similar).[15] As such, whether Hitachi is bound to arbitrate its claims "is an issue for judicial determination." <u>Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Stucco Sys., LLC</u>, 289 F. Supp. 3d 457, 467 (S.D.N.Y. 2018).

---

[15] The Weld defendants argue that these cases are distinguishable because the applicable arbitral rules merely granted the arbitrator discretion to determine the question of arbitrability, whereas the JAMS Rules require it. Reply at 4. However, the outcome of those cases did not turn on the language of the applicable arbitral rules but rather on the fact that the party resisting arbitration, like Hitachi here, was not a signatory to the relevant agreement. Therefore, these cases remain highly instructive.

To resist this conclusion, the Weld defendants rely on numerous cases in which a <u>non-signatory</u> sought to compel a <u>signatory</u> to submit to an arbitrator the question of arbitrability in accordance with a delegation clause. Mot. at 12-13. The Weld defendants cite, for example, <u>Contec Corp. v. Remote Solution, Co.</u>, 398 F.3d 205 (2d Cir. 2005), where the Court held that, "as a signatory to the contract containing an arbitration clause and incorporating by reference the AAA Rules, [the defendant] [could not then] disown its agreed-to-obligation to arbitrate all disputes, including the question of arbitrability." <u>Id.</u> at 211 (emphasis omitted). But such reasoning is inapplicable here because this case presents "the inverse of the situation in <u>Contec</u>: here, it is the <u>signator[ies]</u> that [are] seeking to enforce the arbitration agreement against a non-signatory." <u>Nat'l Union Fire Ins. Co.</u>, 289 F. Supp. 3d at 466 (emphasis in original). Therefore, <u>Contec</u> and its progeny do not undermine our conclusion that the question of arbitrability is for the Court to decide.[16]

---

[16] The Weld defendants also rely heavily on an unpublished Tenth Circuit decision, <u>Casa Arena Blanca LLC v. Rainwater ex rel. Est. of Green</u>, 2022 WL 839800 (10th Cir. Mar. 22, 2022), in which that court considered whether an estate was bound by an arbitration agreement with a medical facility that was signed by the decedent's daughter on the decedent's behalf. <u>Id.</u> at *1. When the estate sued the medical facility, the medical facility invoked the arbitration agreement, which expressly incorporated the JAMS Rules. <u>Id.</u> at *1-2. The Tenth Circuit held that the question of whether the estate was a proper party to the arbitration was a question for the arbitrator to decide under JAMS Rules. <u>Id.</u> at *3. To the extent that those unusual circumstances can be considered analogous to the facts here, we decline to follow the Tenth Circuit's

## C. Arbitrability

Having determined that the question of arbitrability is properly before the Court, we now consider whether Hitachi must arbitrate the two claims it asserts against the Weld defendants: (1) the breach of contract claim in the Guarantee Action, and (2) the fraudulent conveyance claim in the Subrogation Action.  Because the analysis differs in critical respects, the Court will address each claim separately.

### 1. Breach of Contract

In the Guarantee Action, Hitachi's lone claim is that the Weld defendants breached the Cross Guarantee, an agreement expressly providing that "[a]ny legal action based on, related to and/or regarding this Guarantee Agreement shall be brought in any federal or state courts sitting in New York, New York."  Cross Guarantee ¶ 18.  Even though Hitachi's breach of contract claim falls squarely within the scope of Cross Guarantee's mandatory forum selection clause, the Weld defendants argue that Hitachi is nonetheless bound to arbitrate pursuant to two agreements executed years earlier -- the EPA and LLC Agreement -- that Hitachi did not

holding because it conflicts with numerous cases within this Circuit that the Court finds more persuasive.

-19-

sign and does not invoke as a basis for its claim.  We reject this argument and conclude that Hitachi's breach of contract claim remains before this Court.

"The cardinal principle for the construction and interpretation of . . . all contracts is that the intentions of the parties should control." SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC, 467 F.3d 107, 125 (2d Cir. 2006).  Here, Hitachi decidedly manifested an affirmative intent to litigate any claims relating to the numerous loans it guaranteed, including those covered by the Cross Guarantee.  Indeed, the only relevant agreements Hitachi signed -- the (1) Guarantee Agreement, (2) Guarantee Fee Agreement, and (3) Cross Guarantee -- all contain an identical mandatory forum selection clause covering any claims "based on, related to and/or regarding" those agreements.  Now that Hitachi asserts a breach of contract claim based directly on one those agreements, the Court must give effect to Hitachi's desire to litigate, rather than arbitrate, that claim.  Therefore, Hitachi's breach of contract claim belongs in this Court.

In arguing that Hitachi is bound to arbitrate its Cross Guarantee claim under the EPA or LLC Agreement, the Weld defendants rely on various cases in which the same parties were signatories to both an initial arbitration agreement and a subsequent agreement

containing a forum selection clause. Mot. at 19-21; Reply at 8-9. These cases are inapt, however, because Hitachi was never party to an arbitration agreement. Tellingly, the Weld defendants do not cite a single case where a party that asserted a claim pursuant to an agreement containing a forum selection clause it signed was nonetheless bound to arbitrate under an earlier-executed agreement it did not sign. As such, we reject the Weld defendants' contention that Hitachi is bound to arbitrate its claim pursuant to two earlier-executed agreements that it did not sign.

Even if Hitachi were bound by an earlier-executed arbitration agreement, that agreement would be superseded by the Cross Guarantee's forum selection clause. In the Second Circuit, "an agreement to arbitrate is superseded by a later-executed agreement containing a forum selection clause if the clause specifically precludes arbitration." Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth., 764 F.3d 210, 215 (2d Cir. 2014) (internal quotations omitted). To specifically preclude arbitration, the forum selection clause must be "all-inclusive" and "mandatory" but need not expressly mention arbitration. Id. at 215-16.

Here, the Cross Guarantee's forum selection clause demonstrates a specific intent to preclude arbitration because it is both all-inclusive and mandatory. The Cross Guarantee provides

that "[a]ny legal action based on, related to and/or regarding this Guarantee shall be brought in any federal or state courts sitting in New York, New York." Cross Guarantee ¶ 18. The use of the word "shall" makes plain that the provision is mandatory. Goldman, 764 F.3d at 216. The Weld defendants are thus left to argue that the forum selection clause is not all-inclusive because the phrase "legal action" does not encompass arbitration. Mot. at 19-21. Put differently, the Weld defendants claim that to be all-inclusive, a forum selection clause must reference both "actions" and "proceedings" because the term "actions" only refers to litigation whereas the term "proceedings" signifies arbitration.[17] Contrary to the Weld defendants' contention, however, "[t]he United States Supreme Court, Second Circuit, and New York State courts routinely refer to arbitrations as 'actions' or 'proceedings.'" Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth., 922 F. Supp. 2d 435, 442 (S.D.N.Y. 2013), aff'd, 764 F.3d 210 (2d Cir. 2014).[18] Therefore, the phrase "legal action" is

---

[17] The Weld defendants' reliance on Goldman for this proposition is misplaced. There, the Second Circuit simply held that the phrase "actions and proceedings" contained in a forum selection clause was broad enough to preclude arbitration because "the general understanding of 'actions and proceedings' encompasses arbitrations." Goldman, 764 F.3d at 217. The Court did not hold, however, that a forum selection clause must include the term "proceedings" to preclude arbitration. Accordingly, the absence of the word "proceedings" in the Cross Guarantee's forum selection clause does not have the significance that the Weld defendants attempt to assign to it.

[18] See, e.g. Badgerow v. Walters, 596 U.S. 1, 5 (2022) (explaining that a party "initiated an arbitration action"); Pennington v. D'Ippolito, 855 F. App'x 779,

certainly broad enough to encompass, and thus preclude, arbitration. Accordingly, the Cross Guarantee's forum selection clause supersedes any prior arbitration agreement to the extent that Hitachi was bound by such an agreement.

In sum, the EPA and the LLC Agreement do not require Hitachi to arbitrate any claims based on the Cross Guarantee. As such, Hitachi's breach of contract claim in the Guarantee Action, which is predicated solely on the Cross Guarantee, must be litigated in this Court.

## 2. Fraudulent Conveyance

The Subrogation Action presents a different set of circumstances. There, Hitachi invokes the common law right of equitable subrogation and alleges that it "is entitled to stand in the shoes" of Acme's lenders to recover the losses it sustained as a result of Acme's default on the loans it guaranteed. Subrogation Am. Compl. ¶ 3. On this theory, Hitachi asserts numerous claims against several defendants. However, the only claim that Hitachi asserts against the Weld defendants in the Subrogation Action is

---

781 n.2 (2d Cir. 2021) (summary order) (stating that a party "brought an arbitration action"); Nexia Health Techs., Inc. v. Miratech, Inc., 110 N.Y.S.3d 420, 422 (App. Div. 2019) (explaining that "respondent brought an arbitration action for payment").

the fraudulent conveyance claim.  Id. ¶¶ 91-97.[19]  As to that claim specifically, Hitachi alleges that the Weld defendants violated the LLC Agreement by "orchestrat[ing]" a distribution of roughly $57 million of Acme's assets that resulted in Acme's liabilities exceeding its assets.  Id. ¶ 93; see also id. ¶¶ 34, 37.  In response, the Weld defendants argue that by asserting its fraudulent conveyance claim pursuant to the LLC Agreement, Hitachi is bound by the Agreement's arbitration provision despite being a nonsignatory.  We concur.

The Second Circuit has made clear that "[a] nonsignatory party may be bound to an arbitration agreement if so dictated by the ordinary principles of contract and agency."  Thomson-CSF, S.A. v. Am. Arb. Ass'n, 64 F.3d 773, 776 (2d Cir. 1995) (internal quotations omitted).  Indeed, the Circuit has "recognized five theories for binding nonsignatories to arbitration agreements: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel."  Id.  Relevant here, "[e]stoppel of an unwilling non-signatory requires a showing . . . that the non-signatory 'knowingly exploited' the benefits of an agreement with an arbitration clause and derived a 'direct benefit'

---

[19] Because the Weld defendants are the only defendants that move to compel arbitration, the Court's analysis has no bearing on the other claims asserted in the Subrogation Action, all of which remain before this Court.

from the agreement." <u>AICO Int'l, E.C. v. Merrill Lynch & Co.</u>, 98 F. App'x 44, 46 (2d Cir. 2004) (summary order) (quoting <u>MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp.</u>, 268 F.3d 58, 61-62 (2d Cir. 2001)).

A nonsignatory can be said to derive a direct benefit from an agreement containing an arbitration provision when it asserts claims based on that agreement. <u>See</u> <u>Mobile Real Estate, LLC v. NewPoint Media Grp., LLC</u>, 460 F. Supp. 3d 457, 480 (S.D.N.Y. 2020) ("Numerous courts have found that non-signatory parties are estopped from denying arbitration when they rely on or seek direct benefits under an agreement by, for example, bringing suit under that agreement.") (citing cases). Therefore, it must be determined whether Hitachi's fraudulent conveyance claim is, as the Weld defendants assert, dependent on the LLC Agreement.

We conclude that it is. In the operative complaint, Hitachi alleges that "[u]nder the LLC Agreement, [Acme] was prohibited from making distributions to its members if such distributions would render [Acme] insolvent." Subrogation Am. Compl. ¶ 34. This is because, as Hitachi explains, "the LLC Agreement expressly incorporates Section 18-607 of the Delaware Act," which, in turn, prohibits such distributions. <u>Id.</u> Therefore, in allegedly coordinating a distribution of $57 million that rendered Acme

insolvent, the Weld defendants "disregard[ed] [Acme's] non-waivable obligations under the Delaware Act." Id. ¶ 36.  As these allegations demonstrate, the LLC Agreement is at the heart of Hitachi's fraudulent conveyance claim.  Absent the LLC Agreement's express incorporation of the Delaware Act, the Weld defendants (and Acme) would not be subject to that law.[20]  Consequently, by asserting its fraudulent transfer claim pursuant to the LLC Agreement, Hitachi derived a direct benefit from that agreement and is thus estopped from avoiding its arbitration provision as to that claim.

Hitachi's arguments to the contrary are unpersuasive.  First, Hitachi contends that its fraudulent conveyance claim is not based on the LLC Agreement because it "stands in the shoes of [Acme's] lenders" in asserting that claim.  Subrogation Action ECF No. 76 (Hitachi Sur-Reply) at 1.  Even assuming that Hitachi properly asserts its fraudulent conveyance claim on behalf of the lenders, it does not alter the Court's conclusion.[21]  Hitachi's complaint

_____

[20] Additionally, the LLC Agreement provides that "[a]ll issues and questions concerning the application, construction, validity, interpretation and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware[.]"  LLC Agreement § 17.13.

[21] The Court is skeptical that Hitachi can invoke its right of equitable subrogation with respect to its fraudulent conveyance claim.  "Equitable subrogation essentially provides that the guarantor of another's obligation may seek reimbursement from the obligor."  JPMorgan Chase Bank v. Cook, 318 F. Supp. 2d 159, 165 (S.D.N.Y. 2004).  However, in asserting its fraudulent conveyance claim, Hitachi does not merely "seek reimbursement from the obligor."  Id.

makes clear that the fraudulent conveyance claim depends on the LLC Agreement regardless of whether Hitachi asserts the fraudulent claim on its own behalf or on behalf of Acme's lenders. As discussed, there would be no fraudulent conveyance claim absent the LLC Agreement's express incorporation of Delaware law. Therefore, whichever plaintiff is asserting the fraudulent conveyance claim -- whether it is Hitachi itself or Acme's lenders -- it cannot avoid the LLC Agreement's arbitration clause as to that claim.

Second, in its briefing, Hitachi cites New York's fraudulent conveyance statute and argues that it would not need to rely on the alleged violation of the LLC Agreement "to meet its burden of proving a fraudulent conveyance." Id. This assertion, however, is belied by the factual allegations contained in Hitachi's complaint. Cf. Alghanim v. Alghanim, 828 F. Supp. 2d 636, 653 (S.D.N.Y. 2011) ("[I]n determining whether a particular claim falls within the scope of the parties' arbitration agreement, we focus on the factual allegations in the complaint rather than the legal causes of action asserted."). The complaint repeatedly

---

Rather, it seeks damages on behalf of the lenders that, if obtained, would seemingly result in recovery of amounts greater than just reimbursement for the defaults. Therefore, it is unclear that equitable subrogation can be invoked to assert that claim.

mentions Delaware law, quotes the entirety of the relevant Delaware statute, and claims that "the <u>Delaware</u> Act . . . prohibits certain distributions to members of a Delaware limited liability company." Subrogation Am. Compl. ¶ 34 (emphasis added).  By contrast, the complaint does not quote, let alone mention, New York's fraudulent conveyance law, despite how Hitachi attempts to characterize its claim now.  <u>See</u> <u>In re Initial Pub. Offering Sec. Litig.</u>, 241 F. Supp. 2d 281, 354 (S.D.N.Y. 2003) ("[I]t is worth remembering that Plaintiffs are bound by [their] pleadings throughout the course of the proceedings.").  Because Hitachi's fraudulent conveyance claim is wholly dependent on the LLC Agreement, Hitachi cannot now avoid its arbitration provision.

For these reasons, Hitachi is bound to arbitrate its fraudulent conveyance claim against the Weld defendants, which is the sole claim asserted against them in the Subrogation Action.[22] This, however, is the only claim in the Subrogation Action subject to arbitration.  The rest of the claims remain before this Court because the defendants named in those claims have not moved to

---

[22] Because Hitachi's fraudulent conveyance claim must be arbitrated, the Court need not decide whether it has personal jurisdiction over the Weld defendants for that claim.  Accordingly, the Weld defendants' motion to dismiss the fraudulent conveyance claim for lack of personal jurisdiction is denied as moot. ECF No. 53.

compel arbitration or otherwise suggested that those claims are arbitrable.

### D. Stay of Litigation

The Weld defendants request that this litigation be stayed pending resolution of the arbitration regardless of the outcome of the instant motion to compel arbitration because "the core of the disputes [in these actions] will be addressed in the Arbitration pending against" Hitachi's subsidiaries.  Mot. at 21.[23]  Hitachi opposes this request by characterizing it as "procedural maneuvering[]" and a means to further delay the litigation of Hitachi's claims.  Hitachi Opp. at 25.  The Court agrees with Hitachi and denies the Weld defendants' request for a stay.

"The decision to stay the balance of the proceedings pending arbitration is a matter largely within the district court's discretion to control its docket." Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 856 (2d Cir. 1987).  The party requesting a stay "bears a heavy burden of showing necessity for the stay," including showing that it "ha[s] not taken nor will take any steps

---

[23] As discussed above, this is the pending arbitration resulting from the arbitration demand that the Weld defendants filed against Hitachi and its subsidiaries on June 9, 2023.  Unlike Hitachi, Hitachi's subsidiaries do not dispute that they must participate in that arbitration.  See Hitachi Opp. at 3 n.1.

to hamper the progress of the arbitration proceeding, that the arbitration may be expected to conclude within a reasonable time, and that such delay as may occur will not work undue hardship." Sierra Rutile Ltd. v. Katz, 937 F.2d 743, 750 (2d Cir. 1991).

The Weld defendants have not satisfied their heavy burden. First, the Weld defendants contend that a stay is appropriate because the arbitration will be resolved in a timely manner.  Mot. at 22.  But in extolling the virtue of arbitration's "expedited format," id. (quoting N.Y. Cross Harbor R.R. Terminal Corp. v. Consol. Rail Corp., 72 F. Supp. 2d 70, 81 (E.D.N.Y. 1998)), the Weld defendants seem to forget that they waited almost five months from the initiation of the Guarantee Action before even mentioning their intention to seek arbitration, see Guarantee Action ECF No. 20; Subrogation Action ECF No. 33, and waited yet another month to file the arbitration demand against Hitachi and its subsidiaries, see Guarantee Action ECF No. 29-1; Subrogation Action ECF No. 46-1.  These delays clearly demonstrate that the Weld defendants have "taken . . . steps to hamper the progress of" both this litigation and their own arbitration, which, on its own, is sufficient to deny the Weld defendants' request for a stay of litigation.  Sierra Rutile Ltd., 937 F.2d at 750.

Second, the Weld defendants argue that a stay is warranted because "there is significant factual overlap between the remaining claims and the arbitrated claims." Mot. at 22 (quoting Winter Invs., LLC v. Panzer, No. 14 Civ. 6852(KPF), 2015 WL 5052563, at *11 (S.D.N.Y. Aug. 27, 2015)). While factual commonality between claims may supply a basis for a stay in some cases, the argument fails here. In all the cases the Weld defendants cite, the court granted a stay of litigation because the plaintiff's arbitrable claims were closely related, if not identical, to its non-arbitrable claims. See, e.g., Katsoris v. WME IMG, LLC, 237 F. Supp. 3d 92, 111 (S.D.N.Y. 2017); Legal Recovery Assocs. LLC v. Brenes L. Grp., P.C., 22 Civ. 1778(ER)(BCM), 2023 WL 1382134, at *6 (S.D.N.Y. Jan. 31, 2023). These cases, however, are readily distinguishable. The Weld defendants do not cite any factual commonality between Hitachi's arbitrable and non-arbitrable claims. Instead, the Weld defendants point only to the factual commonality between the claims they asserted in their arbitration demand and the counterclaims they asserted in the Guarantee Action just weeks later. See Mot. at 23 (acknowledging that their counterclaims "are nearly identical to the claims" asserted in their arbitration demand). In other words, the Weld defendants seek a stay based solely on

the purported factual similarity that they manufactured themselves in the course of this litigation.  Such gamesmanship will not be rewarded and thus the Court flatly rejects the Weld defendants' factual commonality argument.[24]

Finally, the Weld defendants fail to demonstrate that a stay of litigation would not prejudice Hitachi.  Under the Cross Guarantee, Hitachi is entitled to "full and prompt payment" from the Weld defendants.  Cross Guarantee ¶ 1.  Hitachi sued to enforce that promise in January 2023 and has since invested substantial resources into pressing its claims in this Court.  Because of their procedural maneuverings, however, the Weld defendants have significantly hindered the progress of this litigation.  Any further delay, therefore, would prejudice Hitachi and for this additional reason, a stay of litigation is unwarranted.  See Sierra Rutile Ltd., 937 F.2d at 750 (stating that a stay is not warranted where it would "work undue hardship"); Senisi v. John Wiley & Sons, Inc., 13 Civ. 3314(LTS), 2015 WL 256094, at *6 (S.D.N.Y. Jan. 2015) (denying a stay of litigation because "[plaintiff] should not be

---

[24] The Weld defendants also contend that a stay is warranted because the arbitration against Hitachi's subsidiaries is "almost certain to have a preclusive effect on [Hitachi]."  Mot. at 24 n.14.  However, "it is premature to make any determinations as to the preclusive effect" of the arbitration on Hitachi's claims against the Weld defendants at this juncture.  Gem City Mgmt. Inc. v. Rinde, No. 21 Civ. 7676(RA), 2022 WL 4133429, at *7 (S.D.N.Y. Sept. 12, 2022).

prevented from moving forward with those claims that she stands ready to litigate").

In sum, the Weld defendants' motion to compel arbitration is denied other than as to the fraudulent transfer claim in the Subrogation Action.  Furthermore, because the fraudulent transfer claim must be arbitrated, the Weld defendants' motion to dismiss that claim for lack of personal jurisdiction is denied as moot. Finally, the Court denies the Weld defendants' request for a stay of the litigation pending arbitration.

## II.  Motion to Strike Affirmative Defenses and Dismiss Counterclaims

### A. Legal Standard

Hitachi moves in the Guarantee Action to strike the Weld defendants' affirmative defenses pursuant to Federal Rule of Civil Procedure 12(f) and to dismiss their counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6).  ECF No. 48.

Rule 12(f) provides that the Court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent or scandalous matter."  Fed. R. Civ. P. 12(f).  "Federal courts have discretion in deciding whether to grant motions to strike." Brock Cap. Grp. v. Siddiqui, No. 21 Civ. 2070(NRB), 2022 WL

2047589, at *3 (S.D.N.Y. June 7, 2022).  However, motions to strike "are generally disfavored and will not be granted unless the matter asserted clearly has no bearing on the issue in dispute."  Id. "To prevail on a Rule 12(f) motion to strike, a party must demonstrate that (1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant."  Id.

Rule 12(b)(6) allows a court to dismiss counterclaims for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Rule 12(b) "applies equally to claims and counterclaims; therefore, a motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint."  Gerdau Amersteel U.S. Inc. v. Ameron Int'l Corp., No. 13 Civ. 7169(LGS), 2014 WL 3639176, at *3 (S.D.N.Y. July 22, 2014).

On a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  Endeavor Cap. Holdings Grp., LLC v. Umami Sustainable Seafood, Inc., No. 13 Civ. 4143(NRB), 2014 WL 3897577, at *3 (S.D.N.Y. Aug. 7, 2014). Nonetheless, "[f]actual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all

of the allegations in the complaint are true." <u>Bell Atl. Corp. v.</u>
<u>Twombly</u>, 550 U.S. 544, 555 (2007) (internal citation omitted).
Ultimately, plaintiff must allege "enough facts to state a claim
to relief that is plausible on its face." <u>Id.</u> at 570.  If plaintiff
"ha[s] not nudged [its] claims across the line from conceivable to
plausible, [its] complaint must be dismissed." <u>Id.</u>

**B. Waiver of Affirmative Defenses and Counterclaims**

Hitachi argues that under controlling New York law, the Weld
defendants have waived their eleven affirmative defenses and six
counterclaims because they are required under the Cross Guarantee
to "unconditionally, absolutely, and irrevocably guarantee the
full and prompt payment and performance" of their obligations.
ECF No. 49 (Hitachi Mot.) at 7 (quoting Cross Guarantee ¶ 1).  The
Court agrees with Hitachi and grants its motion to strike the Weld
defendants' affirmative defenses and to dismiss their
counterclaims in full.

Courts applying New York law have repeatedly found that
"broad, sweeping and unequivocal language in an absolute and
unconditional guaranty . . . . forecloses affirmative defenses and
counterclaims." <u>136 Field Point Circle Holding Co., LLC v. Invar</u>
<u>Int'l Holding</u>, 644 F. App'x 10, 12 (2d Cir. 2016) (summary order)

(internal quotations omitted); see also Compagnie Financiere de
CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner &
Smith Inc., 188 F.3d 31, 35 (2d Cir. 1999) ("Absolute and
unconditional guaranties have in fact been found to preclude
guarantors from asserting a broad range of defenses under New York
law."); First N.Y. Bank for Bus. v. DeMarco, 130 B.R. 650, 654
(S.D.N.Y. 1991) ("Absolute and unconditional guaranties . . . are
consistently upheld by New York courts.  Indeed, unconditional
guaranties have been held to foreclose, as a matter of law,
guarantors from asserting any defenses or counterclaims.").[25]

     For example, in 136 Field Point Circle, the guarantee
agreement required that the guarantor "absolutely, unconditionally
and irrevocably guarantee[] . . . the full, complete and timely
payment, performance and satisfaction" of its obligations.  644 F.
App'x at 11.  The agreement further provided the guarantor's
obligations "shall be absolute under any and all circumstances,
without regard to validity, regularity or enforceability of the
[agreement]." Id.  When, upon default, plaintiff sought payment
from the guarantor in accordance with the guarantee agreement, the

---

[25] "Under New York law, the only affirmative defenses that are not waived by an
absolute and unconditional Guaranty are payment and lack of consideration for
the Guaranty." CIT Grp./Com. Servs., Inc. v. Prisco, 640 F. Supp. 2d 401, 410
(S.D.N.Y. 2009).  The Weld defendants do not assert either as a defense.

guarantor argued that the agreement was unenforceable.  Id. at 12.
The Second Circuit rejected that argument, however, because the
agreement's "plain terms, in broad, sweeping and unequivocal
language, bound [guarantor] to the obligations recited in the
[agreement], regardless of whether the [agreement] or its
provisions were enforceable."  Id. at 12-13.  As such, the
guarantor "was foreclosed from challenging its obligations to
ensure payment" as required by the agreement.  Id. at 13.

     This case is indistinguishable.  The Cross Guarantee provides
that the Weld defendants must "unconditionally, absolutely and
irrevocably guarantee to [Hitachi] the full and prompt payment
when due . . . of its Equity Ownership Percentage of any guarantee
payment."  Cross Guarantee ¶ 1.  To remove all doubt, the Cross
Guarantee further states that the Weld defendants "waive all
defense[s], counterclaims and off-sets of any kind or nature"
arising "directly or indirectly from the present or future lack of
validity, binding effect or enforceability of the Existing Loans
or any other document or instrument . . . relating to the Weld
Obligations."  Id. ¶ 7.[26]  This is precisely the kind of "broad,

---

[26] The broad language of the Cross Guarantee's waiver provision directly
contradicts the Weld defendants' contention that the provision is "very limited
in scope" and does not encompass any of the Weld defendants' affirmative
defenses or counterclaims.  ECF No. 58 (Opp.) at 8.  Equally unpersuasive is
the Weld defendants' argument that the waiver provision does not include any

sweeping and unequivocal language" that, under New York law, forecloses any affirmative defenses and counterclaims. <u>136 Field Point Circle Holding</u>, 644 F. App'x at 12. By its plain terms, the Cross Guarantee precludes the Weld defendants from raising any defense or counterclaim related to its validity or enforceability, which encompasses all the Weld defendants' affirmative defenses and counterclaims. <u>See</u> <u>Compagnie Financiere</u>, 188 F.3d at 36 (holding that guarantor waived any defenses where guarantee agreement provided for waiver of "all legal or equitable . . . defense[s]").[27] Therefore, the Weld defendants' eleven affirmative defenses and six counterclaims are waived as a matter of law.

---

defenses or counterclaims "concerning the validity of the [Cross Guarantee] itself" because it "makes no reference to the [Cross Guarantee]." <u>Id.</u> at 10. However, it is nonsensical to suggest that the waiver provision contained in the Cross Guarantee would not apply to the Cross Guarantee itself. In any event, the waiver provision states that the Weld defendants waive all defenses and counterclaims relating to the "Weld Obligations," and it is very clear that the Cross Guarantee relates to those obligations. Cross Guarantee ¶¶ 1, 7. For one thing, the Cross Guarantee is the very agreement that memorializes the Weld Obligations. <u>Id.</u> ¶ 1. For another, the Weld Obligations expressly include any guarantee agreements between the parties, and the Cross Guarantee is obviously such an agreement. <u>Id.</u>

[27] Such waiver extends to the Weld defendants' defenses or counterclaims based on alleged fraud. <u>See</u> <u>JPMorgan Chase Bank N.A. v. Reifler</u>, 614 F. App'x 11, 13 (2d Cir. 2015) (summary order) ("[A]bsolute and unconditional guaranties have been found to preclude guarantors from asserting a broad range of defenses under New York law, including fraud in the inducement."); <u>Huntington Tech. Fin., Inc. v. Neff</u>, 612 F. Supp. 3d 5, 31 (D. Conn. 2020) ("New York courts have consistently held that guarantees such as Defendants' absolute and unconditional Guaranty are enforceable, even in extreme cases such as when the guaranty at issue is induced by fraud or even, as here, where Defendants claim that portions of the [agreement] are unenforceable.").

The Weld defendants' efforts to circumvent the Cross Guarantee's broad waiver are unavailing. First, the Weld defendants claim that the Cross Guarantee's waiver is unenforceable because it would bar the Weld defendants' "compulsory counterclaims," leaving them "without a forum to bring [their] claims." Opp. at 6. This argument is meritless. The only case the Weld defendants cite for this proposition is Sage Realty Corp. v. Insurance Co. of North America, 34 F.3d 124 (2d Cir. 1994), which involved a breach of lease claim, not breach of a guarantee agreement. Under the lease agreement, the tenant waived only its right to assert counterclaims in a specific type of action. Id. at 126-27. "Clearly," the Court reasoned, "the parties never intended for the waiver provision to prohibit [tenant] from ever bringing a counterclaim or from seeking redress for its claims, but rather anticipated that [tenant] could bring its claims in a separate action." Id. at 129. By contrast, the parties here expressly agreed to waive any "defense[s], counterclaims and off-sets of any kind or nature" relating to the Cross Guarantee's validity or enforcement in all cases, not just in a specific type of action. Cross Guarantee ¶ 7. As discussed above, such unambiguous language has consistently been found to foreclose any "affirmative defenses and counterclaims" regardless

of whether they are purported to be "compulsory." <u>136 Field Point Circle</u>, 644 F. App'x at 12.

Second, the Weld defendants assert that several of their affirmative defenses cannot be waived because they are based on Hitachi's wrongful post-Cross Guarantee conduct, namely, Hitachi's alleged decision not to renew its guarantees of Acme's debt, which accelerated Acme's loans and triggered its default.  Opp. at 14-15.  The Weld defendants are correct that an absolute and unconditional guaranty does not necessarily "foreclose a guarantor's challenge that the creditor's wrongful post-execution conduct triggered the event that accelerates or causes the guarantor's liability."  <u>Legal Recovery Assocs. LLC v. Brenes L. Grp., P.C.</u>, 22 Civ. 1778(ER)(BCM), 2023 WL 2253138, at *10 (S.D.N.Y. Feb. 13, 2023), <u>report and recommendation adopted by</u> 2023 WL 2266534 (S.D.N.Y. Feb. 28, 2023).  The flaw in the Weld defendants' argument, however, is that the conduct they claim was "wrongful" is, in fact, expressly permitted by the Cross Guarantee.  Indeed, the Cross Guarantee provides:

> Each Guarantor, as applicable, may, without notice or demand and without affecting its rights hereunder . . . accelerate or otherwise change the amount of, the time of payment of, or other terms relating to, any or all of the Obligations, or otherwise modify, amend or change the terms of the Existing Loans or any other document or instrument evidencing, securing or otherwise relating to the Obligations[.]

Cross Guarantee ¶ 6.  As this provision makes clear, Hitachi's decision not to renew its guarantee is not "wrongful" under the Cross Guarantee and thus the triggering exception on which the Weld defendants rely does not apply here.

In light of the foregoing, the Weld defendants have waived their affirmative defenses and counterclaims.  Accordingly, Hitachi's motion to strike the affirmative defenses and dismiss their counterclaims is granted in full.

## CONCLUSION

For the foregoing reasons, the Weld defendants' motion to compel arbitration is denied in part and granted in part. Specifically, the Weld defendants' motion is denied as to the breach of contract claim in the Guarantee Action but granted as to the fraudulent transfer claim in the Subrogation Action.  Because the fraudulent transfer claim must be arbitrated, the Weld defendants' motion to dismiss that claim for lack of personal jurisdiction is denied as moot.  Moreover, the Weld defendants' request for a stay of litigation pending arbitration is denied in full.  Finally, plaintiff's motion to strike affirmative defenses and dismiss counterclaims is granted in full.  The Clerk of Court is respectfully directed to terminate the motions pending at ECF Nos. 23, 35, and 48 in the Guarantee Action (No. 23 Civ. 490) and

ECF Nos. 28, 35, 37, 45, 53, and 60 in the Subrogation Action (No. 23 Civ. 1396).

       **SO ORDERED.**

Dated:    New York, New York
          December 6, 2023

                             NAOMI REICE BUCHWALD
                      UNITED STATES DISTRICT JUDGE